Emil ROSSDEUTSCHER, on his own behalf and on behalf of all others similarly situated, Plaintiff Below, Appellant,

v.

VIACOM, INC., Defendant Below, Appellee.

No. 444, 1999.

Supreme Court of Delaware.

Submitted: Feb. 29, 2000.

Decided: March 9, 2001.

As Revised April 2, 2001.

Joseph A. Rosenthal, Esquire and Jeffrey S. Goddess, Esquire of Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, Delaware; Of Counsel: Lawrence Deutsch, Esquire (argued) and Lane L. Vines, Esquire of Berger & Montague, P.C., Philadelphia, Pennsylvania, for Appellant.

William M. Lafferty, Esquire and S. Mark Hurd, Esquire of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware; Of Counsel: Stuart J. Baskin, Esquire (argued), Alan S. Goudiss, Esquire and John Gueli, Esquire of Shearman & Sterling, New York, New York, for Appellee.

Before VEASEY, Chief Justice, WALSH and HOLLAND, Justices.

VEASEY, Chief Justice.

This case of first impression involves the application of the implied covenant of good faith and fair dealing to the contractual rights of holders of derivative securities issued in connection with the separate but nearly contemporaneous mergers of Paramount Communications, Inc. (Paramount) and Blockbuster Entertainment, Inc. (Blockbuster) into Viacom, Inc. (Viacom). These securities are known as Contingent Value Rights (CVRs)—in the case of the Paramount merger—and Variable Common Rights (VCRs)—in the case of the Blockbuster merger. Each of these securities was designed to provide a "collar" to protect the values that the former Paramount and Blockbuster stockholders received as consideration in the mergers. Thus, the values of the CVRs and the VCRs varied inversely to the price of Viacom stock at certain specified time periods after the mergers.

The complaint alleges that Viacom deliberately released false economic data at the critical time periods for the purpose of artificially and temporarily inflating the price of its stock. Plaintiff contends that

Viacom's intentional inflation of its own stock price improperly and intentionally reduced the payout under the CVRs and VCRs, thus depriving the holders of these derivative securities of a substantial portion of the consideration they reasonably expected to receive in exchange for their votes for the mergers.

The trial court dismissed the action as time-barred, holding that the shorter federal securities statute of limitations applied because the complaint alleges facts that would have constituted a cause of action under the federal securities laws. The reasoning of the trial court was that the plaintiff "attempts to skirt" his statute of limitations "problem by filing his action as one for breach of contract." The trial court concluded that, because the "essence of plaintiff's suit" is securities fraud, plaintiff "was entitled to file a timely suit for securities fraud under section 10 and Rule 10b–5" of the federal Securities Exchange Act of 1934 (the '34 Act). The trial court held, in dismissing the complaint as time-barred, that it "would be counter-productive to recognize a broader common law remedy for what is plainly on its face a securities violation when there already exists statutory redressability at the federal level." [1]

The defendant's motion to dismiss was granted by the trial court solely on the federal statute of limitations ground without reaching the other grounds for dismissal that had been asserted by Viacom. Those grounds are now asserted on appeal by Viacom as alternative grounds to support an affirmance of the judgment of the trial court, even if this Court should disagree with the trial court that the claim is time-barred.

Among the various issues raised on this appeal, the two principal ones are whether: (a) the trial court correctly decided that the shorter federal statute of limitations for federal securities violations applies so as to bar this claim filed in state court solely as a state breach of contract action (without any reference to the securities laws) for violation of the implied covenant of good faith and fair dealing where the longer state contract statute of limitations would not have barred the claim; and (b) Viacom's preexisting legal duty not to violate the federal securities laws precludes plaintiff from asserting the covenant of good faith and fair dealing as a contractual claim on the ground that the covenant, which is tantamount to an implied promise not to violate the securities laws, is not supported by consideration.[2]

We hold that: (1) this action for breach of contract under state law is not time-barred because the state contract statute of limitations [3] and not the federal securities statute of limitations applies; and (2) the alternative grounds asserted by Viacom to sustain the judgment of the trial court, including the pre-existing legal duty rule, do not bar the plaintiff's claim under Count I for violation of the covenant of good faith and fair dealing. We conclude, however, that Count II of plaintiff's complaint for unjust enrichment fails to state a claim on which relief may be granted. Accordingly, we reverse in part and affirm in part the judgment of the trial court and remand this action for proceedings consistent with this Opinion.

### Facts

Emil Rossdeutscher, a holder of Viacom's CVR securities at the time of their redemption, filed this action in the Dela-

---

1. *Rossdeutscher v. Viacom, Inc.*, Del.Super., C.A. No. 98C–03–091, 1999 WL 743443 (Aug. 30, 1999), Mem. Op. at 6.

2. Viacom also argues alternatively that plaintiff has failed to state a claim under Count II for unjust enrichment and that plaintiff lacks standing for failure to comply with a notice

requirement imposed on CVR holders. We reach these issues as well on this appeal.

3. As the Superior Court's opinion notes, New York law, which is applicable to the CVRs, has a six year statute of limitations and Delaware law, which is applicable to the VCRs, has a three year statute. Mem. Op. at 5.

ware Superior Court against Viacom. He purports to bring the action "on behalf of a Class consisting of all persons who held the CVRs and VCRs at the time of their respective redemption and who were damaged by defendant Viacom's actions." [4] Viacom filed a motion to dismiss on various grounds under Superior Court Rule 12(b)(6). For purposes of the motion the well-pleaded facts alleged in the complaint are taken as true. Hence the statement of facts that follows is taken from the allegations set forth in the complaint.

### (1) The Contractual Terms of the Securities

In 1994 Viacom acquired Paramount and Blockbuster by separate mergers. Viacom, a Delaware corporation, is the surviving corporation of each merger. In each merger, the merger consideration consisted of a mix of securities and cash to the former Paramount and Blockbuster stockholders as an inducement to those stockholders to vote for the mergers.

The holders of the CVRs issued as consideration in the Paramount merger were entitled to receive cash, and the holders of the VCRs issued in the Blockbuster merger were entitled to receive Viacom common stock upon the redemption in 1995 of their respective securities. The CVRs and the VCRs were contractual obligations of Viacom promising specific additional compensation if Viacom's stock did not reach certain price levels in 1995. The amount of cash or stock that the holders were entitled to receive was inversely related to the price of Viacom stock on stated "valuation dates." These securities provided a protective "collar" to the former Paramount and Blockbuster stockholders as a form of downside protection related to the future Viacom stock price on specified dates.

By their terms, the CVRs were redeemable at Viacom's option on the Maturity Date of July 7, 1995, or specified dates thereafter. Viacom had the option to pay the amount due under the CVRs, if any, "in cash or in the equivalent value of registered securities of [Viacom], including without limitation, common stock, preferred stock, notes or other securities." The payment due under the CVRs was the amount by which $48 (the "Target Price") exceeded the greater of either (i) the median of the average closing price of Viacom Class B Common Stock for certain specified periods preceding the Maturity Date or (ii) the "Minimum Price." The Target and Minimum Prices varied depending on whether Viacom decided to extend the Maturity Date beyond July 7, 1995. The higher the median average closing price of Viacom's stock during the relevant valuation periods (so long as it exceeded the Minimum Price), the less was the payment to which CVR holders were entitled on redemption.[5]

---

4. The caption of the Superior Court's Opinion and the caption in this Court refer only to plaintiff Rossdeutscher, a holder of CVR securities. Although there was no reference in the Superior Court Opinion or the briefs on appeal, we note that another plaintiff, Dennis M. Kelly, a holder of VCR securities, was permitted to intervene in the Superior Court.

5. The CVR terms as stated by Viacom were as follows: "The contingent value rights (the "CVRs") represent the right to receive the amount, if any, by which $48 (the "Target Price") exceeds the greater of the median of the averages of the closing prices of Viacom Class B Common Stock, during each 20 consecutive trading day period that both begins and ends during the 60 day trading period immediately preceding July 7, 1995, the first anniversary of the Paramount Merger (the "Maturity Date"), or $36 (the "Minimum Price"). The Company, at its option, may pay any amount due under the terms of the CVRs in cash or in the equivalent value of registered securities of the Company, including, without limitation, common stock, preferred stock, notes or other securities. The Company has not yet determined the form of payment of any amounts due under the CVRs. In addition, the Company, at its option, may extend the Maturity Date to July 7, 1996, the second anniversary of the Paramount Merger (the "First Extended Maturity Date"), or extend the First Extended Maturity Date to July 7, 1997, the third anniversary of the Paramount Merger (the "Second Extended Maturity Date"). The Target Price is adjusted at the First Extended Maturity Date and Second

The CVRs contained discretionary "triggers" for Viacom to exercise its right of redemption. At its sole discretion Viacom could trigger the redemption of the CVRs at their maturation dates in the summer of 1995, or at later anniversary dates. Viacom's stock price spiked up for a short period in 1995, corresponding to the valuation period, and later receded. As a result of this temporary increase in its stock price, Viacom paid only a fraction of its potential exposure to the security holders when Viacom then exercised the CVR triggers on redemptions.[6] Viacom exercised its option to redeem the CVRs on July 7, 1995, and on that date paid CVR holders approximately $83 million for their CVR certificates.[7]

### (2) The Charging Allegations of the Compliant

The compliant is particularized and clear. In essence, it alleges that Viacom deliberately and improperly frustrated the

> Extended Maturity Date to $51 and $55, respectively. The Minimum Price is adjusted at the First Extended Maturity Date and Second Extended Maturity Date to $37 and $38, respectively. The Company cannot yet determine the amount of its obligation, if any, under the CVRs."

**6.** The provisions applicable to the VCRs were similar. The VCR terms as stated by Viacom were as follows: "The VCRs represent the right to receive shares of Viacom Class B common stock under certain circumstances on the first anniversary of the Effective Time (the "VCR Conversion Date"). The number of shares of Viacom Class B Common Stock into which the VCRs will convert will generally be based upon the value of Viacom Class B Common Stock (the "Class B Value") determined during the 90 trading day period (the "VCR Valuation Period") immediately preceding the VCR Conversion Date. The Class B Value will be equal to the average closing price of a share of Viacom Class B Common Stock during the 30 consecutive trading days in the VCR Valuation Period which yields the highest average closing price of a share of Viacom Class B Common Stock. In the event that the Class B Value is more than $40 per share but less than $48 per share, each VCR will convert into 0.05939 of a share of Viacom Class B Common Stock on the VCR Conver-

contractual rights of CVR and VCR holders by artificially and temporarily inflating the Viacom stock price during the critical period in which the values to these holders were adversely affected. When the falsity of the information was learned by the market, Viacom's stock price receded. But then it was too late because the artificial and temporary spike in the stock price hit—as it was allegedly designed to do—during the critical period when the CVR and VCR holders would have received significant compensation for their bargained-for downside protection.

The complaint sets forth in detail how the scheme was allegedly perpetrated. Excerpts from the complaint as it relates to the CVRs[8] follow:

> 2. ... Pursuant to the terms of the CVRs, if Viacom's share price was maintained above $48 before July 7, 1995, holders of the CVRs would receive no additional compensation from Viacom .... These derivative

sion Date. If the Class B Value is $40 per share or below, the number of shares of Viacom Class B Common Stock into which each VCR will convert on the VCR Conversion Date will increase ratably from 0.05929 of a share to the maximum of 0.13829 of a share of Viacom Class B Common Stock, which will occur if the Class B Value is $36 per share or below. If the Class B Value is $48 per share or above, the number of shares of Viacom Class B Common Stock into which the VCR will convert on the VCR Conversion Date will not exceed 0.5929 of a share of Viacom Class B Common Stock if the average of the closing prices for a share of Viacom Class B Common Stock exceeds $40 per share during any 30 consecutive trading day period."

**7.** The VCRs were redeemed on September 29, 1995. On that date, Viacom issued approximately 6.4 million shares of its Class B Common Stock to the VCR holders, worth approximately $327 million.

**8.** For purposes of this Opinion we will quote only those portions of the complaint dealing with the CVRs that were part of the consideration received by the former Paramount stockholders. We do this not only in the interests of brevity. The principles set forth in this Opinion apply to the VCR holders, as well.

securities had sliding scales so that the further Viacom's price fell below ... $48 ..., the more compensation or shares would be issued to the holders of the CVRs....

3. Following these mergers, the securities market expected Viacom's share price to only increase about $40/share during 1995. **Therefore, the defendant undertook extraordinary, improper and misleading actions, to boost its share price and thereby diminish the amount of compensation and the number of new shares it would issue pursuant to the CVRs....**

4. **The inflated results reported by the company successfully, though temporarily, boosted Viacom's stock price. Therefore, when the CVRs came due by July 1995, ... the Company paid far less compensation ... than it potentially owed.**

5. **Viacom misrepresented and concealed facts about its financial results,** prospects, accounting practices and expected earnings during the CVR ... valuation periods. Specifically, Viacom inflated its purchase accounting adjustments and consequently understated its amortization costs, thus ballooning its income for the first three quarters of 1995. Viacom also deferred purchases of videos for its Blockbuster Video subsidiary, resulting in lower reported costs during the first three quarters of 1995, thereby further inflating its reported income.

\* \* \*

23. After issuing these CVR ... derivative securities to entice the Paramount ... shareholders to agree to these acquisitions by Viacom, **Viacom then made extensive efforts to boost Viacom's share price and thereby minimize the number of new Viacom shares or other compensation that** would have to be issued pursuant to the terms of the CVRs.... **To do this Viacom exaggerated its prospects during 1995 and deceptively boosted its 1995 short-term financial results until the final trigger date, September 29, 1995, when the VCRs expired.**

24. While it issued positive earnings reports and projections during 1995, Viacom deliberately failed to disclose the following key facts:

● Viacom had misleadingly inflated its purchase accounting adjustments as set forth in Accounting Principles Board Opinion No. 16 ("APB No. 16") and thus understated its amortization of associated costs. This practice ballooned its income for the first three quarters of 1995.

● Viacom also deferred purchases of videos, resulting in lower reported costs, thereby further inflating its reported income during the first three quarters of 1995.

● Viacom had acquired Blockbuster Video for an excessive amount. Consequently Viacom should have written down the value of its Blockbuster assets during 1995, rather than carry excess goodwill on its balance sheets.

25. Defendant was successful in its efforts to misleadingly present its 1995 results and thereby caused the price of Viacom shares to rise as high as $54 during the CVR ... valuation periods in 1995. Consequently, the number of shares and other compensation later issued via the formula of the CVRs ... was radically reduced.

26. **Defendant's statements to boost share prices and thereby minimize the number of shares issued under the CVRs ... were successful,** as demonstrated by securities analysts' adoption of Viacom's projections and the analysts' "buy" recommendations through 1995.

* * *

29. On April 10, 1995, *Barron's*, however, described Viacom's concern over its exposure from the VCRs, with Viacom's shares only trading at approximately $46:

There's big money involved in the Viacom trade because the current market value of the rights is $400 million, and the potential payoff is more than twice that amount.

If Viacom's stock holds at its current level, the company will have to issue about 15 million shares of stock, worth $675 million, to holders of the 225 million Variable Common Rights, or VCRs. And, assuming no change in Viacom's shares, the company is expected to redeem its other rights issue, some 55 million of Contingent Value Rights, or CVRs, by paying $165 million in cash or securities.

Viacom's total tab rises to $1.3 billion if its stock drops to 36. But if Viacom stock rises to 48 during the valuation periods, one of which begins this week, it has to pay nothing to the CVR holders. And if Viacom shares get to 52, the company has no liability for its VCRs.

30. At this key juncture in April 1995, with the stock still hovering in the mid–40's and the Company facing significant stock dilution if the share price did not rise, Viacom accelerated its efforts to boost Viacom's share price during the upcoming valuation period. In order to accomplish this short term goal, Viacom held a conference on April 24–25 with analysts. Viacom emphasized its significant growth expectations for 1995 and beyond, in its statements to analysts . . . .

* * *

32. **Viacom's inflated results reported for the quarter fueled analysts' expectations and induced the analysts to recommend buying Viacom stock.**

* * *

35. Viacom continued reporting inflated results. These results, along with the defendant's bold claims of further expected growth, continued to delude analysts to expect increasing share prices for Viacom . . . .

* * *

40. **Viacom's stock was inflated during the final months of the pricing periods; therefore, Viacom escaped with little damage, paying only $83 million on its obligations under the CVRs . . . . At the time the instruments were issued, Viacom had an initial liability of $687 million for the CVRs . . . .**

41. **After the final VCR valuation date, September 29, 1995, however Viacom could no longer mask its operating problems.** It could no longer defer proper amortization and defer purchases of videos. **The result was that after the VCR valuation date, Viacom's reported operating results sank far below previous results. Viacom's share price therefore deteriorated until trading fell to lower levels, even below $40, after September 1995. This price level contrasted to Viacom's previously inflated share prices above $50, caused by Viacom's misleading statements during the key valuation periods in 1995.**

* * *

42. In 1997 it was disclosed that Viacom had manipulated its results during the CVR and VCR valuation periods. As reported in *The Wall Street Journal* ("WSJ") **on Febru-**

ary 21, 1997, former controlling shareholder of Blockbuster, Wayne Huizenga, described the misleading statements of Viacom which had previously inflated Viacom's share price.

\* \* \*

43. Describing the impact of the accounting and manipulation and consequent inflation of Viacom's shares, the *WSJ* article noted:

Mr. Huizenga complains that Viacom wasn't sufficiently open about the impact of the critical accounting change after the merger.... By writing down ... costly inventory, Viacom in effect sharply reduced Blockbuster's expenses. That served to "sweeten earnings,".... The strong numbers helped drive up Viacom's stock to a high of $54 a share that year.

44. **Confirming this belated disclosure of Viacom's true condition, on August 6, 1997,** *The Wall Street Journal* **reported that Viacom Inc. had a second-quarter loss of $195 million, including a $323 million charge related to its attempts to fix its floundering video and music retailer Blockbuster Entertainment. The** *WSJ* **article reported that analysts estimated that Blockbuster only had a value of $2.7 billion to $3.6 billion, compared with the $8.4 billion Viacom spent to acquire Blockbuster in 1994.[9]**

Based upon these facts and the plaintiff's contentions of law, the complaint seeks class action certification, damages and other relief based on two common law counts (and without any reference to the federal securities laws). Count I is based on the common law of contract asserting, in substance, that:

- Viacom was obligated to act in good faith and to deal fairly with the CVR holders in carrying out Viacom's obligations under the terms of the CVRs;

- Those obligations included proper financial reporting so that the Viacom stock price would be properly set during the valuation periods and that Viacom would refrain from distorting its financial condition so as to affect the CVR holders adversely;

- Viacom artificially inflated its stock price and diminished the payout under the CVRs, thereby thwarting the reasonable expectations of the holders of those securities; and

- Viacom thereby breached the implied covenant of good faith and fair dealing with the holders of the CVRs.

Count II is for restitution based on unjust enrichment. It is based on the following contentions:

- That when the CVRs were issued it was understood that Viacom would have to compensate for any shortfall in the Viacom stock price during the valuation periods;

- By inflating the stock price, Viacom was able to redeem the CVRs at a much lower cost than if the true value of the shares had been known; and

- Therefore, Viacom enriched itself at the expense of the holders, entitling them to restitution in the amount by which defendant unjustly enriched itself.[10]

### Superior Court Decision

The principal ground of Viacom's motion to dismiss was that plaintiff "seeks to prosecute time-barred securities law claims ... [labeled as] a breach of contract action ... for Viacom's alleged bad faith misrepresentation of its financial condition.... [P]laintiff's attempted resurrection of a

---

9. The emphasis shown above in various excerpts from the complaint is added for purposes of this Opinion.

10. These allegations also apply to the VCR holders.

time-barred securities claim in the guise of a contractual breach must be rejected...." Aside from one reference to the unjust enrichment count, the Superior Court did not address that count of the complaint. We infer from its opinion that the unjust enrichment count was also dismissed because of the Superior Court's view that it was in reality a time-barred securities claim.

The following additional grounds asserted by defendant in support of its motion to dismiss are before us as alternative grounds to affirm the judgment of the Superior Court:

- The claim based on breach of the implied covenant of good faith and fair dealing is barred by the "pre-existing legal duty rule" because it is based on a contract that lacks consideration in that Viacom was bound by its pre-existing duty to abide by the federal securities law;

- Lack of standing to sue as a CVR holder for failure to comply with the no-action clause contained in the CVR Agreement; and

- Failure to state a claim for unjust enrichment because the subject matter of the dispute is governed by the parties' contracts and Viacom has not benefitted.

The Superior Court found the federal statute of limitations to be the dispositive ground, and dismissed the complaint on that basis alone without reaching the other grounds. The decision of the Superior Court on the dismissal based on the federal statute of limitations was based on a syllogism that can be paraphrased as follows:

- Section 10(b) of the '34 Act and Rule 10b–5 promulgated thereunder prohibit securities fraud;

- Private rights of action for securities violations under 10(b) of the '34 Act "are of judicial creation," having been implied under the statute and recognized by the Supreme Court; [11]

- Private claims "under section 10(b)" are governed by a statute of limitations barring claims not commenced within one year after discovery of facts constituting the violation and within three years after the violation;

- Discovery of the alleged fraud in artificially inflating the stock price occurred February 21, 1997, when Wayne Huizenga complained of that conduct (see ¶¶ 42–43 of the Complaint quoted above);

- Under the federal securities statute of limitations, any complaint *under* section 10(b) would have to have been filed by February 21, 1998, *i.e.*, within one year of the discovery date;

- This complaint was filed on March 11, 1998, nineteen days late for an action under section 10(b); and, therefore,

- Even though the complaint is a state claim, based on contract and does not purport to be brought under section 10(b)(or any other provision) of the '34 Act and even though it would not have been time-barred under the applicable state limitations statutes, it is nevertheless barred here because plaintiff "was entitled to timely file suit for securities fraud under section 10 and Rule 10b–5" and "cannot breath life into a dead securities action by recasting it as a breach-of-implied covenant contract claim." [12]

## Has Plaintiff Alleged Federal Securities Fraud Claims Merely Labeled as State Contract Claims?

The parties agree that this Court reviews *de novo* a trial court's decision to

---

11. *Citing Lampf v. Gilbertson*, 501 U.S. 350, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991) and *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 730, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975).

12. Mem. Op. at 5–6.

grant a motion to dismiss.[13] We must determine if there is any ground asserted by Viacom that can sustain the judgment of the Superior Court. We start with the holding of the Superior Court transforming Rossdeutscher's claims for breach of contract and unjust enrichment into a claim for securities fraud under section 10(b) of the '34 Act, and concluding that these claims were, therefore, time-barred.

Contrary to the Superior Court's view, Rossdeutscher's ability to maintain a Rule 10b–5 suit is not free from doubt. The Superior Court concluded that Rossdeutscher was entitled to maintain an action under Rule 10b–5 because he is a "purchaser" of securities under that Rule. The Superior Court reasoned that "plaintiff 'sold' securities when Viacom 'purchased' the CVR's ... from the plaintiff by redeeming them for cash and stock."[14] A number of federal courts have squarely rejected this reasoning. In this case, the CVR holders held the CVRs until Viacom exercised its redemption rights. Based on similar facts, federal courts have found either that the alleged fraud was not "in connection with a purchase or sale," or

that the "reliance" or "transaction causation" element of a 10b–5 claim is lacking because no investment decision was made as a result of the alleged fraud.[15] Although some federal courts might not have dismissed Rossdeutscher's suit,[16] it is not clear that Rossdeutscher had a viable securities claim. Therefore we do not view his complaint as "recasting" a securities action as a common law action in order to avoid the shorter federal statute of limitations.

Section 28(a) of the '34 Act expressly states that the federal statutory remedies of the Act over which federal courts have exclusive jurisdiction [17] are intended to co-exist with claims based on state law and not preempt them: "The rights and remedies provided by [the '34 Act] shall be in addition to any and all other rights and remedies that may exist at law or in equity."[18] This language, which is not limited to state securities statutes or common law fraud actions, suggests that the express intention of Congress was that the federal securities law would not dilute any remedies allowed by the states, either in law or equity.

13. *See Desert Equities v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, Del.Supr., 624 A.2d 1199, 1204 (1993).

14. *See Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 750, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975).

15. *See Isquith v. Caremark Intl., Inc.*, 7th Cir., 136 F.3d 531, 534 (1998) (dismissing class action suit under Rule 10b–5 because the plaintiffs had made no "investment decision," and had not been "induced by ... a misrepresentation or a misleading omission to buy or sell a stock"); *Continental Cas. Co. v. State of New York Mortgage Agency*, N.D. Ill., 1994 WL 532271, 1994 U.S. Dist. Lexis 13617, Nordberg, J., (Sept. 21, 1994) (dismissing suit alleging fraud in connection with early redemption of bonds, noting that "[t]he Seventh Circuit has held, without caveat, that fraud is not 'in connection with' the sale or purchase of a security as to a plaintiff who was not in a position to make an investment decision in reliance on the fraud"); *Lewis v. Dow Chemical Co.*, D. Del., C.A. No. 91–534, McKelvie, J. (Sept. 11, 1992), Mem. Op. at 4–9 (assuming, without deciding, that redemption of CVRs

was a "sale," but holding that the plaintiff could not show "transaction causation" because "it appears that the plaintiff would have had to redeem his CVRs even if no fraud had occurred").

16. While none of the cases cited by Viacom is directly on point, some courts have adopted a reading of Rule 10b–5 that could fairly be interpreted to bring this lawsuit within the "in connection with a purchase or sale" requirement of Rule 10b–5. *See, e.g., Pittsburgh Terminal Corp. v. Baltimore and Ohio R.R.*, 3d Cir., 680 F.2d 933, 938–940 (1982) (holding that "the conversion option in a convertible debenture qualifies as a contract for purchase or sale of a security"). In that case, however, as in others Viacom relies on, the conversion right belonged to the bondholders, who thus had to decide whether to elect to convert. *Id.*

17. *See* 15 U.S.C. § 78aa; *Matsushita Electric Industrial Co. v. Epstein*, 516 U.S. 367, 370, 116 S.Ct. 873, 134 L.Ed.2d 6 (1996).

18. *See also* 15 U.S.C. § 77p (containing identical language in Section 16 of the 1933 Act).

The scope of that language appears to include the breach of contract and unjust enrichment claims of Rossdeutscher. "Common law and 10b–5 both provide relief for the same wrong—in other words, just because 10b–5 provides a remedy [it] will not preempt the common law and, similarly, that common law permits recovery will not bar a 10b–5 suit." [19] Contract claims and securities claims arising out of the same operative facts may co-exist.[20] "It is well-settled that federal law does not enjoy complete preemptive force in the field of securities" and "'far from preempting the field,' Congress has expressly preserved the role of the states in securities regulation." [21]

Rule 10b–5 is almost universally viewed as broader than common law fraud claims, the differences being their respective treatment of "reliance, privity, materiality, causation, injury, and scienter." [22] Accordingly, because Rule 10b–5 generally encompasses common law claims, the implication of Viacom's argument and the position of the trial court is that all state common law fraud actions involving the "purchase or sale of a security" would be transformed into a federal securities fraud action. Such a result is antithetical to the savings clause of the '34 Act and would ignore material differences in the elements and remedies of the claims.[23] Although Viacom resists having its argument labeled as a preemption argument, adoption of its position would effectively result in preemption of common law claims by federal securities laws.

Viacom asserts that even if Rossdeutscher could not assert a 10b–5 action, he could have asserted an action under Section 9 of the '34 Act, which Viacom describes as prohibiting market manipulation of any kind. This argument fails for two reasons: (1) the '34 Act does not preempt state common law actions; and (2) the type of manipulation claimed by Rossdeutscher focuses on certain accounting and business decisions that are different from the type of market manipulations normally addressed by Section 9.[24] There-

---

**19.** 5A Arnold S. Jacobs, *Litigation & Practice Under Rule 10b–5* § 11.01 (1999). This treatise acknowledges that even though 10b–5 is "procedurally more advantageous and substantively broader than the common law," the common law remedies, though probably harder to prove, "permit redress in most (if not all) 10b–5 areas and in a large number of other fields." *Id.* Furthermore, "[e]ven in those areas in which 10b–5 and the common law overlap, redress sometimes can only be found under the common law." *Id.* (citing claims about corporate *mismanagement* as an example). *See also Baker, Watts & Co. v. Miles & Stockbridge*, 4th Cir., 876 F.2d 1101 (1989).

**20.** The discussion in the *Jacobs* treatise focuses on common law fraud actions, but includes other common law claims in its discussion as well. The general point that Rule 10b–5 does not preempt common law claims is unaffected by the treatise's focus on common law fraud because that is merely one type of common law claim. In fact, since the overlap between common law fraud and Rule 10b–5 is greater than the overlap between contract claims and 10b–5, the conclusion that common law fraud actions are not pre-empted strengthens the argument that a plaintiff can pursue contract-based claims.

**21.** *Baker, Watts & Co.*, 876 F.2d at 1107 (quoting L. Loss, *Fundamentals of Securities Regulation* 8 (2d ed.1998)). *See also Malone v. Brincat*, Del.Supr., 722 A.2d 5, 13 (1998) (discussing "Delaware carve-outs" as exceptions to federal preemption of securities class actions involving nationally traded securities under the Securities Litigation Uniform Standards Act of 1998).

**22.** *Jacobs, supra n. 19* at § 11.01.

**23.** *See id.*

**24.** *See Jacobs, supra,* n. 19, § 3.02 (listing the six types of manipulative actions proscribed by Section 9, including certain wash sales or matched transactions, and transactions that create the impression of an active market, including purchases or sales through rumors or touting, and similar transaction-oriented manipulations); 2 Thomas Lee Hazen, Treatise on the Law of Securities Transactions § 12.1, at 376 (3d ed. 1995) ("[T]he overwhelming majority of cases support the narrow definition [of the term 'manipulation'].") This case involved a redemption of the CVRs. Thus, Viacom's "purchase" of the derivative securities did not occur in an open market transaction.

fore, not only would Rossdeutscher be unable to proceed under 10b–5, but also his ability to pursue a claim under Section 9 is doubtful. Even if he had elected to pursue a timely Section 9 claim in the federal court, it does not follow that his state court contract claims would perforce be barred.

### The Well–Pleaded Complaint Rule Supports Rossdeutscher

■ In addition to the foregoing reasons for allowing Rossdeutscher's lawsuit to proceed, under the well-pleaded complaint rule as articulated by the Supreme Court in *Caterpillar*[25] a plaintiff is normally able to proceed under the law that the pleader elects, rather than have state law claims involuntarily recast by a court as claims under federal law. Viacom argues that the *Caterpillar* well-pleaded complaint rule is irrelevant, and it reiterates its contention that it is not arguing federal preemption.

But Viacom ignores the context of the *Caterpillar* discussion, which explains the relationship between the well-pleaded complaint rule and the doctrine of complete preemption. The Supreme Court in *Caterpillar* defined the doctrine of complete preemption, as "an 'independent corollary' to the well-pleaded complaint rule."[26] Typically, "[t]he presence or absence of federal-question jurisdiction is governed by the 'well-pleaded complaint rule,' which provides that federal question jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint."[27] The essence of the teaching of *Caterpillar* is that the well-pleaded complaint "rule makes the plaintiff the master of the claim: he or she may avoid federal jurisdiction by exclusive reli-

ance on state law."[28] Consequently, *Caterpillar* is consistent with the analysis that complete preemption does not apply to Rossdeutscher's contract and unjust enrichment claims.[29]

Finally, Viacom warns this Court that "reversing the Superior Court would mean that any issuer of securities could be sued years after expiration of the federal securities laws' statute of limitations, so long as the lawsuit is given a different label by a creative plaintiff." We disagree. Separate actions may co-exist. The argument that the choice of theories merely boils down to "labels" simply begs the question. If contract theories and federal securities theories are not identical—and they are not—it follows that federal and common law claims can proceed independently. The only limitation in this context is that a plaintiff may not receive overlapping or duplicate damages for the same act. That is not an issue in this case.

### Pre–Existing Legal Duty Rule

■ We now turn to the alternative grounds advanced by Viacom in support of the Superior Court's dismissal of the Complaint. The first alternative ground is based on the "pre-existing legal duty rule." Viacom argues that because it had a pre-existing legal duty to comply with federal securities laws, there can be no contractual liability for breaching those duties. The basis of this theory, according to Viacom's argument, is that Rossdeutscher cannot state a claim for breach of the implied covenant of good faith and fair dealing because it is a contract claim that must fail for want of consideration because the im-

25. *See Caterpillar Inc. v. Williams*, 482 U.S. 386, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987).

26. *Id.* at 393, 107 S.Ct. 2425 (citations omitted).

27. *Id.* at 392, 107 S.Ct. 2425.

28. *Id.*

29. That conclusion is further strengthened by the fact that 10b–5 actions are a judicially created remedy, and therefore the hurdle of overcoming the savings clause in the statute would appear even greater. At best, one might infer the validity of 10b–5 actions through legislative acquiescence, but one cannot infer Congressional intent to preempt the field from an action by the courts which the Congress has not challenged.

plied covenant is coextensive with the duty not to violate the federal securities laws.

New York law recognizes an implied duty of good faith and fair dealing as part of its contract law.[30] The implied obligation encompasses "any promises which a reasonable person in the position of the promisee would be justified in understanding were included." [31] Though not an express term of the contract, the promise sought to be enforced is "implicit in the agreement as a whole." [32] The implied covenant is breached when "one party seeks to prevent the contract's performance or withhold its benefits." [33] Thus, in the appropriate case, the implied covenant ensures that a party is not unfairly deprived of the benefit of its bargain where "the other party has violated the spirit, although not the letter, of the contract." [34]

A breach of the implied covenant is a breach of contract.[35] Viacom argues that Rossdeutscher cannot state a claim for breach of the implied covenant as a matter of contract law based on Viacom's alleged violations of federal securities law because Viacom was under a "pre-existing legal duty" to comply with those laws. In support of its argument, Viacom cites language from several New York cases. In *Goncalves v. Regent Int'l Hotels*,[36] the New York Court of Appeals stated that "a promise to perform an existing legal obligation is not valid consideration to provide a basis for a contract." In *James A. Haggerty Lumber & Mill Work, Inc. v. Thompson Starrett Construction Co.*,[37] the New York intermediate appellate court stated that "neither the promise to do a thing, nor the actual doing of it, will be a good consideration if it is a thing which the party is bound to do by the general law, or by a subsisting contract with the other party." [38]

A brief examination of the rule demonstrates that it does not apply to this case.[39]

**30.** *See Dalton v. Educational Testing Service,* 87 N.Y.2d 384, 639 N.Y.S.2d 977, 663 N.E.2d 289, 291 (1995) ("Implicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance.") (citations omitted).

**31.** *Id.* (*citing Rowe v. Great Atl. & Pac. Tea Co.,* 46 N.Y.2d 62, 412 N.Y.S.2d 827, 385 N.E.2d 566 (1978) (citation omitted)).

**32.** *Rowe,* 412 N.Y.S.2d 827, 385 N.E.2d at 570.

**33.** *Metropolitan Life Ins. Co. v. R.J.R. Nabisco, Inc.,* S.D.N.Y., 716 F.Supp. 1504, 1517 (1989).

**34.** *Harris Trust and Savings Bank v. E–II Holdings,* 7th Cir., 926 F.2d 636, 642 (1991) (discussing implied covenant of good faith under New York law, *citing Metropolitan Life,* 716 F.Supp. at 1517).

**35.** *Geler v. National Westminster Bank USA,* S.D.N.Y., 770 F.Supp. 210, 215 (1991).

**36.** 58 N.Y.2d 206, 460 N.Y.S.2d 750, 447 N.E.2d 693, 700 (1983).

**37.** 22 A.D.2d 509, 256 N.Y.S.2d 1011, 1012–13 (1965).

**38.** *Id.* (citations and internal quotations omitted). *See also International Paper Co. v. Suwyn,* S.D.N.Y., 951 F.Supp. 445, 448 (1997) ("[A] promise to perform an existing legal or contractual obligation is, without more, insufficient consideration to support a new contract.").

**39.** We note that the pre-existing legal duty rule applies in (at least) two distinct scenarios. The first, relevant to this case, concerns a pre-existing legal duty to conform to the law. The second, not at issue here, concerns a promisor's pre-existing duty under a contract. The latter application of the rule is usually in contract modification cases in which a promisor seeks additional consideration for that which he is already contractually obligated to do. *See Seidel v. Lee,* D.Del., 954 F.Supp. 810, 818 (1996) (noting this distinction). *See also* 2 Corbin on Contracts § 7.1 at 342 ("The rule had its origins in the striking down of coerced modifications."); 3 Williston on Contracts § 7.36 at 569 ("As a general principle, when a party does simply what he has already obligated himself to do under a contract, he cannot demand any additional compensation or benefit, and it is clear that if he takes advantage of the situation and obtains a promise for more, the law in general regards it as not binding as lacking consideration."). Because of this distinction,

We begin by noting that the doctrine applies only to the question whether a contract is supported by valid consideration. The pre-existing duty rule holds that a promise to do what one is legally obligated to do—in this case, according to Viacom's argument, conform to federal securities laws—is not valid consideration.[40] The rule is grounded in "the same notions of policy that are applicable in the case of public officers,"[41] namely, that courts will not suppose that the promisor had any alternative but to conform to the law, and that therefore his promise to do so involves no detriment or forbearance.[42]

In this case, it is not disputed that a legal contract supported by valid consideration was formed between the CVR holders and Viacom. The CVR holders are not attempting to enforce a promise by Viacom to comply with federal securities laws. The CVR holders did not provide consideration in return for a promise merely to obey the law.[43] Rather, they paid for protection against devaluation of the Viacom stock. Rossdeutcher's complaint alleges that Viacom took actions that rendered this bargained-for-protection meaningless, in violation of Viacom's obligation of good faith and fear dealing. That this activity *may* also violate federal securities law is beside the point.

One cannot reasonably construe Rossdeutcher's complaint as seeking to enforce an agreement to comply with federal securities law. As discussed above, Rossdeutscher's common law claim is independent of federal securities law. Viacom's pre-existing legal duty argument would effectively preclude any cause of action for breach of contract whenever the factual predicate of the contract claim is also colorably a violation of *any* statute or regulation prohibiting the conduct that also constituted the breach of contract. Viacom's argument would also create an artificial distinction between breaches of the implied covenant of good faith that involve indisputably legal activity and those that arguably involve illegal activity. Thus it would perversely allow *less* possibility of common law redress for the latter. Viacom's argument is without merit. Accordingly, we reject its argument that the judgment of the Superior Court should be affirmed on that alternative basis as to Count I of the complaint which is based on the implied covenant of good faith and fair dealing.

### *No–Action Clause*

An additional argument advanced by Viacom in support of dismissal of the complaint is that Rossdeutscher failed to comply with the no-action clause in the

the cases cited by Viacom that address contract modification are inapposite to this case. *See Haggerty,* 256 N.Y.S.2d at 1012 (applying pre-existing duty rule where defendant sought contract modification); *International Paper,* 951 F.Supp. at 447–48 (discussing whether defendant had "preexisting contractual duty").

**40.** 2 Corbin on Contracts § 7.11 at 392; 3 Williston on Contracts § 7.41 at 670–71.

**41.** 2 Corbin on Contracts § 7.11 at 391.

**42.** *Id.,* §§ 7.11, 7.12.

**43.** In contrast, the contract in *Goncalves* appears to have recited as consideration that which was already a statutory obligation. *See Goncalves,* 460 N.Y.S.2d 750, 447 N.E.2d at 700 (holding that an agreement limiting a hotel's liability in return for the hotel's provision of a safe deposit box is unenforceable, since "the proprietor is required by statute to provide a safe to the guest"). *But see id.* 460 N.Y.S.2d 750, 447 N.E.2d at 706 (Jasen, J., dissenting, joined by Jones and Simon, JJ.) (questioning the application of the preexisting legal duty doctrine on the particular facts of *Goncalves* ). Similarly, other cases cited by Viacom refuse to enforce contracts to the extent that they rest on a promise to conform to the law. *See Seidel,* 954 F.Supp. at 818 ("Therefore, the Court dismisses this count to the extent that Plaintiff's contract claim is premised upon the *alleged securities violations.* However, Plaintiff may pursue this claim *to the extent that it is based upon a breach of other obligations.*") (emphasis added).

CVR Agreement.[44] Section 806 of the CVR Agreement provides that no CVR holder may commence "any action or proceeding at law or in equity ... upon or under or with respect to this Agreement" unless (i) written notice of the breach is first provided to the CVR Trustee and (ii) the Trustee refuses to sue despite having received a demand to do so from at least 25 percent of the CVR holders. Rossdeutscher does not dispute his failure to comply with these provisions. According to Viacom, this noncompliance means that Rossdeutscher has no standing to sue.

Rossdeutscher argues that compliance was not required once the CVRs were redeemed in July 1995. We find merit to this argument, and conclude that under New York law failure to comply with the no-action provisions does not support dismissal of Rossdeutscher's complaint.

No-action clauses are a common feature of indenture agreements. Bondholders who wish to bring suit against the issuer must comply with such clauses in order to withstand dismissal of their suit.[45] The "primary purpose" of a no-action clause is to:[46]

> protect issuers from the expense involved in defending lawsuits that are either frivolous or otherwise not in the economic interest of the corporation and its creditors. In protecting the issuer such clauses protect bondholders. They protect against the exercise of poor judgment by a single bondholder or a small group of bondholders, who might otherwise bring a suit against the issuer

that most bondholders would consider not to be in their collective interest.

Once the CVRs were redeemed, there were no CVR holders, and hence no holders in need of the protection against unworthy lawsuits that no-action clauses are designed to provide. We note, moreover, that by its terms Section 806 limits the right of a "Holder" to bring suit.[47] On its face, Section 806 does not apply to one who is no longer a "Holder." This is a common sense result.

The principal cases on which Viacom relies are not contrary to this view. In *York v. Guaranty Trust Co.*,[48] the Court held that noteholders could sue the indenture trustee for breach of fiduciary duty "despite the absence of a res." The reason for this holding was that "where ... an indenture confers upon a trustee the power to sue for noteholders and other powers, the trustee holds these powers in trust."[49] Thus, in *York* the holders were *allowed* to sue the *trustee* for breach of its fiduciary obligations without complying with the no-action clause in the Indenture Agreement. *York* does not support Viacom's argument that *former* holders *cannot* sue the *issuer* in this case. At most, it supports the view that the trustee in this case could also sue Viacom on behalf of the holders (which it has not done).

Viacom also relies on cryptic language in a summary affirmance of a trial court order by the Appellate Division, First Department, of the New York Supreme Court in the case of *Bank of New York v.*

---

**44.** The VCR Agreement does not contain a no-action clause. Hence this argument has no application to Kelly's standing to pursue a claim on behalf of VCR holders.

**45.** *See, e.g., Cruden v. Bank of New York*, 2d Cir., 957 F.2d 961, 967–68 (1992); *Friedman v. Chesapeake & Ohio Rwy. Co.*, S.D.N.Y., 261 F.Supp. 728, 730 (1966).

**46.** *Feldbaum v. McCrory*, Del. Ch., C.A. No. 11866, 1992 WL 119095, Allen, Ch., (June 2, 1992), Mem. Op. at *6.

**47.** The term "Holder" is defined on the face of the CVR certificate itself.

**48.** 2d Cir., 143 F.2d 503, 512 (1944).

**49.** *Id.*, 143 F.2d at 512. The rationale for this holding is that an "intangible" item, such as a "chose (thing) in action" can constitute a "res." *Id.* See also *Clarke v. Chase Natl. Bank*, 2d Cir., 137 F.2d 797, 801 (1943) (Hand, J., dissenting in part) (agreeing that the trustee continues to hold "some rights of action in trust for the bondholders").

*Battery Park City Authority*,[50] which states that "[p]laintiff's contention that the clause does not apply to former bondholders whose interests have been redeemed flies in the face of their attempt to enforce the bond resolution." We do not believe this language, which is not a holding of New York's highest court, the Court of Appeals, is controlling here either as a matter of *stare decisis* or common sense. In the case before us none of the former holders has an interest in approving or not approving this suit, and the language of this particular indenture applies only to "Holders."

Accordingly, we reject Viacom's argument that the no-action clause deprives Rossdeutscher of standing to sue on behalf of the CVR holders.[51] Therefore, since we do not find merit in any of the grounds Viacom advances to support dismissal of Count I of the complaint based on breach of the implied covenant of good faith and fair dealing, we reverse the judgment of the Superior Court as to that count.

### Unjust Enrichment

■ Viacom contends that Rossdeutscher cannot bring a claim of unjust enrichment as asserted in Count II of the complaint. Although the Superior Court did not expressly state the grounds for dismissing Count II, that count re-alleges the same facts alleged in Count I. Therefore, the holding of the Superior Court dismissing Count I on the erroneous view that it was a federal securities action would apply to Count II as well. As discussed above, we have rejected that view. Accordingly, we must consider whether the judgment of the Superior Court dismissing the unjust enrichment claim should be affirmed on the alternative ground advanced by Viacom that it fails to state a claim upon which relief can be granted.

Viacom argues that the unjust enrichment claim cannot be maintained as a matter of New York law because (1) "the subject matter of the dispute is governed by an enforceable contract between the parties" and (2) "Viacom has not benefitted from the conduct complained of," rather, its stockholders have. Because we agree that Rossdeutscher's unjust enrichment claim should be dismissed based on the first argument, we do not reach the second.

Under New York law, "the existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter."[52] In some circumstances alternative pleading allows a party to seek recovery under theories of contract and quasi-contract.[53] This is generally so, however, only when there is doubt surrounding the enforceability or the meaning of the terms of the contract in question.[54] "Courts generally dismiss claims

**50.** 251 A.D.2d 211, 675 N.Y.S.2d 860 (1998).

**51.** Because we hold that noncompliance with the no-action clause does not require dismissal of the complaint, we do not reach Rossdeutscher's alternative argument that suit may be brought under Section 807 of the Indenture Agreement, which in certain circumstances gives Holders the right to sue to "receive payment of the amounts payable" on the CVRs.

**52.** *Clark–Fitzpatrick, Inc. v. Long Island Rail Road Co.*, 70 N.Y.2d 382, 521 N.Y.S.2d 653, 655, 516 N.E.2d 190 (1987).

**53.** *See Sternberg, Inc. v. Walber 36th St. Assoc.*, 187 A.D.2d 225, 594 N.Y.S.2d 144, 145 (1993) (holding that "it has never been the law in New York" that "a claim in contract and one in quasi contract are mutually exclusive in all circumstances"). *See also* Restatement (Second) of Contracts § 373 cmt. a (describing recovery of restitution interest to prevent unjust enrichment as an "alternative" to recovery of contract damages).

**54.** *See Sternberg* at 145 (distinguishing the *Clark–Fitzpatrick* rule and allowing quasi-contract claim to proceed because "the contract at issue here is silent as to plaintiff's entitlement to a commission in the event a sale of the building occurred for a lesser price"); *Knudsen v. Quebecor Printing (U.S.A.) Inc.*, S.D.N.Y., 792 F.Supp. 234, 237 (1992) (allowing alternative contract and quasi-contract theories where "the complaint does not set

for quantum meruit on the pleadings ... when it is clear from the face of the complaint that there exists an express contract that clearly controls."[55]

In this case, Rossdeutscher's complaint alleges that he and the class are entitled to recover under the terms of an express contract that clearly governs the subject matter of this dispute on the ground that the complaining class was deprived of rights thereunder because Viacom violated the implied covenant of good faith and fair dealing. As discussed above, the CVR terms are detailed as to the rights of CVR holders. In his claim alleging breach of the implied covenant of good faith and fair dealing, a contract claim,[56] Rossdeutscher alleges that Viacom subverted the express contractual CVR terms and the rights it provides by inflating the Viacom share price. Rossdeutscher's rights are clearly set forth in the contract, and any recovery would likewise be premised on what he should have received under the pricing formulas set forth in the contract had there not been the alleged artificial inflation of the Viacom stock that frustrated the ability of the CVR holders to collect their proper compensation under the express terms of the CVR securities. Therefore, under New York law, his unjust enrichment claim should be dismissed on the pleadings for failure to state a claim on which relief may be granted.

### Conclusion

For the reasons set forth above, we reverse the judgment of the Superior Court insofar as it dismissed Count I of the complaint. We affirm the judgment insofar as it dismissed Count II, but our affirmance is based on an alternate ground. We remand the case to Superior Court for proceedings consistent with this Opinion. We expect that our disposition of the case, in dealing with Viacom's alternative grounds that were presented to the Superior Court but not decided by it, will enable the Superior Court to move along expeditiously the remainder of this protracted case.

---

forth an express contract: the contract, if it is found to exist, must be inferred"). *See also Farash v. Sykes Datatronics, Inc.,* 59 N.Y.2d 500, 465 N.Y.S.2d 917, 452 N.E.2d 1245, 1247 (1983) (allowing quasi-contract claim where contract between parties was unenforceable because of the Statute of Frauds).

55. *Knudsen,* 792 F.Supp. at 237. *See also Sternberg,* 594 N.Y.S.2d at 146.

56. Importantly, the contract claim in *Clark–Fitzpatrick* was based on "implied contractual obligations," as is Rossdeutscher's contract claim. *Id.* at 390, 594 N.Y.S.2d 144. Thus, the fact that Rossdeutscher's contract claim asserts breach of an implied covenant does not change the analysis since this claim is based on a "valid and enforceable written contract." *Id.* at 388, 594 N.Y.S.2d 144.