# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| CLP TOXICOLOGY, INC., | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CASLA BIO HOLDINGS LLC, et al., | ) | |
| Defendants. | ) | |
| _____ | ) | |
| CASLA BIO HOLDINGS LLC and | ) | |
| CASLA BIO GP, LLC, | ) | |
| Counterclaim-Plaintiffs, | ) | |
| | ) | **C.A. Nos. 2018-0783-PRW,** |
| v. | ) | **2019-0401-PRW,** |
| | ) | **and** |
| CLP TOXICOLOGY, INC., and | ) | **C.A. No. N18C-10-332 PRW** |
| ALTERNATIVE BIOMEDICAL | ) | **CCLD** |
| SOLUTIONS LLC, | ) | |
| Counterclaim-Defendants. | ) | |
| _____ | ) | |
| CASLA BIO HOLDINGS LLC, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CLP TOXICOLOGY, INC., and | ) | |
| ALTERNATIVE BIOMEDICAL | ) | |
| SOLUTIONS, LLC, | ) | |
| Defendants. | ) | |
| _____ | ) | |

Submitted: March 18, 2021
Decided: June 14, 2021
Issued: June 24, 2021*

## MEMORANDUM OPINION AND ORDER

*Upon Counterclaim-Defendant CLP Toxicology, Inc.'s Motion to Dismiss*
**GRANTED IN PART, DENIED IN PART.**

Christopher Viceconte, Esquire, GIBBONS P.C., Wilmington, Delaware; Anthony J. Rospert, Esquire, Thomas M. Ritzert, Esquire, THOMPSON HINE LLP, Cleveland, Ohio; Heather M. Hawkins, Esquire, THOMPSON HINE LLP, Cincinnati, Ohio. *Attorneys for Plaintiff/Counterclaim-Defendant CLP Toxicology, Inc.*

Peter B. Ladig, Esquire, Elizabeth A. Powers, Esquire, BAYARD, P.A., Wilmington, Delaware; Jordan D. Weiss, Esquire, Allison R. Klein, Esquire, GOODWIN PROCTER LLP, New York, New York. *Attorneys for Defendant/Counterclaim-Plaintiffs Casla Bio Holdings, LLC and Casla Bio GP, LLC.*

**WALLACE, J.**

This is a dispute between the parties to a Securities Purchase Agreement (the "SPA"). Counterclaim-Plaintiffs Casla Bio Holdings LLC ("Casla" or "Company Seller") and Casla Bio GP, LLC ("Blocker Seller" and together with Casla, the "Seller Defendants") sold all the securities of Alternative Biomedical Solutions ("ABS") to CLP Toxicology, Inc. ("CLP"). ABS provides management and administrative services to laboratories, including (1) leasing and sale of toxicology and chemistry measurement systems and software used for controlled substance monitoring and drug testing, and (2) furnishing related supplies, drug analytical standards, internal standards, chemicals and solvents, and services. CLP is a private investment firm focused on making equity and debt investments in North American middle market companies in a variety of industries.

Each party alleges, among other counts, that the other breached the SPA. CLP alleges that Seller Defendants defrauded it of millions of dollars through various avenues, including concealing the loss of important customers and manipulating the EBITDA for the sale of ABS.[1] Seller Defendants allege CLP breached the SPA by diverting funds to avoid making earnout payments, failing to grant access to books and records, and failing to transfer $█████████ in accounts receivable notes in

---

\* This decision is issued after consideration of the parties' requests for redaction of certain of their or other non-parties' confidential information and with the Court's own necessary corrections.

[1] Am. Compl. ¶¶ 8-10, Jan. 17, 2019 (D.I. 22).

exchange for lowering the total purchase price.[2]  Before the Court now is CLP's motion to dismiss Seller Defendant's counterclaims.

CLP's Motion is **GRANTED** as to Counterclaim Counts I (breach of SPA Section 3.3) and IV (civil conversion); and is **DENIED** as to Counterclaim Counts II (breach of SPA Section 3.2(i)), III (breach of the ALS Notes Agreement), and V (unjust enrichment).

## I. FACTUAL BACKGROUND

### A. THE SECURITIES PURCHASE AGREEMENT

In December 2017, CLP purchased all the securities of ABS from Seller Defendants pursuant to the SPA; that is, through the agreement CLP received 100% equity interest in ABS.[3]

Section 3.3 of the SPA specifically provides that a portion of the purchase price may be potentially reduced by a Contingent Payment to Seller Defendant based on ABS's Gross Profit for calendar year 2018.[4]  The Contingent Payments Provision lays out such payments to Seller Defendants as follows:

> (i) If in calendar year 2018 (the "Earnout Period"), the Group Companies have at least $██████ but less than $█████ of Gross Profit as reflected on their audited consolidated financial statements for the fiscal year ending

---

[2]  Am. Countercl. ¶¶ 5-8, Nov. 12, 2020 (D.I. 97).

[3]  *Id.* ¶ 1.

[4]  *Id.* ¶ 38.

December 31, 2018 (the "2018 Audited Financials"), Buyer will pay to the Sellers (in proportion to the allocation percentages set forth on the Closing Allocation Schedule) $█████████;

(ii) If during the Earnout Period the Group Companies have at least $█████████ but less than $█████████ of Gross Profit as reflected on the 2018 Audited Financials, Buyer will pay to the Sellers (in proportion to the allocation percentages set forth on the Closing Allocation Schedule) $█████████; and

(iii) If during the Earnout Period the Group companies have $█████████ or more of Gross Profit as reflected on the 2018 Audited Financials, Buyer will pay to the Sellers (in proportion to the allocation percentages set forth on the Closing Allocation Schedule) $█████████ (the payments described in this Section 3.3(a), the "Contingent Payment").[5]

In order to determine whether Seller Defendants were entitled to any Contingent Payments, the parties were required to agree on the calculation of Gross Profit of ABS during the Earnout Period.[6] Per SPA Sections 3.3(c)–(f):

(c) No later than ten (10) days following Buyer's receipt of the 2018 Audited Financials, Buyer shall deliver to the Company Seller a copy of the 2018 Audited Financials, together with a certificate of Buyer confirming the Amount of Gross Profit as set forth on the 2018 Audited Financials and aggregate Contingent Payment and aggregate Contingent Payment payable to sellers in connection therewith (if any). From and after the delivery of the 2018 Audited Financials, Buyer and the Company shall provide the Company Seller and any Representatives, accountants or advisors retained by the Company Seller with reasonable access to the books and records of the Group Companies for the purpose of enabling the Company Seller and its accountants and advisors to calculate, and to review Buyer's calculation and preparation

---

[5]   *Id.* ¶ 39.

[6]   *Id.* ¶ 41.

of Gross Profit as set forth on the 2018 Audited Financials and the aggregate Contingent Payment payable to Sellers in connection therewith (if any).

(d) If Company Seller disputes the calculation of Gross Profit as set forth on the 2018 Audited Financials and the aggregate Contingent Payment payable to Sellers in connection therewith (if any), then Company Seller shall deliver a written notice (a "Contingent Payment Dispute Notice") to Buyer at any time during the forty-five (45) day period commencing upon receipt by the Company of the 2018 Audited Financials. The Contingent Payment Dispute Notice shall set forth the basis for the dispute of any such calculation in reasonable detail. Any dispute set forth in any Contingent Payment Notice Dispute delivered in accordance with this Section 3.3 shall be subject to, and settled in accordance with, the Dispute Resolution Procedures mutatis mutandis. If Company Seller does not dispute Buyer's calculation of the Contingent Payment within such forty-five (45) day period, such calculation shall be final and binding on all parties hereto.

(f) [F]rom and after the Closing through the Earnout Period, Buyer will and will cause its Affiliates and the Group Companies to act in good faith and not engage in any conduct for the primary purpose of circumventing the achievement of the Contingent Payment.[7]

Section 3.2 of the SPA prescribes the process by which the parties are to determine the Closing Net Working Capital Amount. Section 3.2(b) specifically reads:

No later than ninety (90) days following the Closing Date (the "Closing Statement Date"), [CLP] shall, at its expense, (i) cause to be prepared an unaudited consolidated balance sheet of [ABS], . . . (the "Closing Balance Sheet"), together with a statement (the "Closing Date Schedule") setting forth in reasonable detail

---

[7] *Id.* ¶¶ 41-42.

- 4 -

[CLP's] calculation of the Closing Net Working Capital Amount, Closing Cash, Closing Indebtedness, and Seller Transaction expenses and (ii) deliver to the [Seller Defendants] the Closing Balance Sheet and the Closing Date Schedule, together with a certificate of [CLP] confirming that the Closing Balance Sheet and the Closing Date Schedule were properly prepared in good faith and in accordance with this Section 3.2(b). The accounts included in the Closing Balance Sheet and the Closing Date Schedule, including the Closing Net Working Capital Amount, Closing Cash, Closing Indebtedness and Seller Transaction Expenses, shall be prepared in accordance with the Accounting Principles[.][8]

Section 3.2(c)(i) sets forth the materials CLP had to provide to Seller Defendants to determine the Closing Net Working Capital Amount:

[CLP] and [ABS] shall provide [Seller Defendants] and any Representatives, accountants or advisors retained by [Seller Defendants] with reasonable access to the books and records of [ABS] for the purpose of enabling [Seller Defendants] and their respective accountants and advisors to calculate, and to review [CLP's] calculation and preparation of, the Closing Net Working Capital Amount[.][9]

Section 3.2(c) sets forth the process for resolving disputes between the parties regarding the Closing Net Working Capital Amount:

If [Seller Defendants] dispute the calculation of any of the Closing Net Working Capital Amount . . . set forth in the Closing Date Schedule, then [Seller Defendants] shall deliver a written notice (a "Dispute Notice") to [Seller Defendants] at any time during the thirty (30) day period commencing upon receipt by [Seller Defendants] of the Closing Balance Sheet, the Closing Date Schedule and the related certificate of [CLP] (the "Review

---

[8] Am. Countercl. ¶ 54.

[9] *Id.* ¶ 55.

Period"). The Dispute Notice shall set forth the basis for the dispute of any such calculation in reasonable detail.[10]

If the parties are unable to resolve any dispute following the issuance of the Dispute Notice, the SPA provides that "either party shall have the right to refer such dispute to the Designated Accounting Firm."[11]

## B. ADVANCED LABORATORY SERVICES PROMISSORY NOTES

Prior to Closing, Advanced Laboratory Services ("ALS"), an ABS customer, purchased equipment from ABS.[12] The money owed by ALS ("The ALS Balance") was recorded on ABS's Accounts Receivable.[13] At some point after the purchase, ALS communicated to ABS that it was struggling to pay the amounts owed.[14] To resolve this, ABS and ALS agreed to convert the amount owed to ABS into structured promissory notes ("ALS Notes") in the amounts of $███████ and $███████, totaling $████████.[15]

On December 14, 2017, three days prior to closing, CLP objected to the recordation of the ALS Balance as accounts receivable and refused to reserve ALS's

---

[10]   *Id.* ¶ 56.

[11]   *Id.*

[12]   *Id.* ¶ 21.

[13]   *Id.*

[14]   Am. Countercl. ¶ 22.

[15]   *Id.* ¶ 23; *see id.* at Exs. A, B, and C (ALS Promissory Notes).

equipment purchase on ABS's Most Recent Balance Sheet for purposes of determining the Closing Net Working Capital Amount.  To resolve this, Seller Defendants proposed that ABS "[r]emove 100% of the notes from working capital and Casla receives 100% of the collections from the note."[16]  Through its representative at Lazard—who acted as CLP's liaison for SPA negotiations—CLP agreed via e-mail to removal of the ALS Notes from Working Capital in exchange for Seller Defendants receiving 100% of the collections from the note, excluding legal fees.[17]

Later the same night CLP agreed to Seller Defendants' proposal, Seller Defendants' counsel e-mailed CLP's counsel stating they agreed "that Company Seller (as lender) will enter into notes directly with [ALS] for $⬛⬛⬛ and $⬛⬛⬛ (which represents A/R owed by ALS to ABS currently that Centre has written down to zero, and that Centre has agreed to allow Company Seller to pursue directly for its own account.)"[18]  Counsel for CLP replied "[a]s for the assigned AR, I was expecting more on the schedule.  Also, where is the schedule that shows equal

---

[16]  *Id.* ¶ 26; *see id.* at Ex. D (E-mails between Seller Defendants and Lazard Regarding ALS Notes).

[17]  *Id.* at Ex. D.

[18]  *Id.* at Ex. E (E-mails between Counsel for Seller Defendants, Lazard, and Counsel for CLP Regarding Revised SPA).

reduction in AR on the estimated closing balance sheet?"[19] Counsel for CLP further stated that the purchase price would be reduced by $███████ with Seller Defendants collecting "the receivables" and indicated it was not aware of whether the $███████ in Accounts Receivable on the Net Working Capital statement includes the items in Schedule 8.12.[20]

On December 15, 2017, former CLP principal, William James, stated via e-mail that "[g]iven all of the changes that have happened on the fly in the last 12 hours for the closing BS/NWC, we need to add the closing balance sheet estimate somewhere and clearly the changes we made to it (A/R for accounts being assigned to Casla, etc.)."[21]

The final SPA Schedule 8.12 assigns Accounts Receivable due from InHealth Diagnostics, LLC and Intire Tox Screen to ABS.[22] It does not include the ALS Notes or Balance and the SPA makes no mention of ALS.[23] In accordance with Schedule 8.12, the Closing Net Working Capital schedule provides for an adjustment

---

[19] *Id.*

[20] Am. Countercl., Ex. E.

[21] *Id.* at Ex. O (E-mail from Former CLP Principal William James Regarding Accounts Receivable at Closing).

[22] Countercl. Def.'s Opening Br. 48, Dec. 11, 2020 (D.I. 104) (hereinafter "Countercl. Def.'s Open. Br.").

[23] *Id.* at 47-48.

in the amount of $███████.[24]   The schedule states "[t]he Company prior to close executed two notes receivable with [ALS] which by definition are excluded from working capital."[25]   The removal of the ALS Balance from ABS's Most Recent Balance ultimately reduced the purchase price paid by CLP to Seller Defendants and the Balance was not incorporated into the Calculation of the Closing Net Working Capital Amount.[26]

On December 18, 2017, one day after closing, Jared Rochwerg of Seller Defendants e-mailed ABS inquiring about the status of the ALS Balance and Seller Defendants' right to collect on the Balance via the ALS Notes.[27]   Janet McGrath, an ABS employee, replied that another ABS employee was handling the situation and that she would get an update on the notes.[28]

In early January 2018, Ms. McGrath followed up with Mr. Rochwerg regarding the ALS Notes and forwarded him the executed Notes via e-mail.[29]   In that

---

[24]   Am. Countercl., Ex. P (ABS Closing Net Working Capital Schedule).

[25]   *Id.*

[26]   *Id.* ¶ 31.

[27]   *Id.* ¶ 32, Ex. F (E-mail from Jared Rochwerg to Janet McGrath regarding status of ALS Notes).

[28]   *Id.*

[29]   *Id.* ¶ 33.

communication, Ms. McGrath wrote "[w]e finally received the ALS notes. What do we need to do as next steps? Casla took these, right [?]"[30]

Five months later, Samuel Hines of Casla reached out to Mr. James via telephone to discuss the ALS Notes.[31] During the conversation, Hines requested CLP honor its agreement and transfer the ALS Balance, any corresponding ALS Notes or the right to collect on the Balance to Seller Defendants.[32] Mr. James refused to transfer the Balance or any amounts collected thereunder or the right to collect on the Balance via the ALS Notes due to the potential that Seller Defendants might attempt to collect on the Balance too aggressively.[33] And CLP has yet to transfer the Balance, any corresponding Notes, or the right to collect on the Balance to Seller Defendants.[34]

---

[30]   Am. Countercl. ¶ 33, Ex. G (E-mail from Janet McGrath to Jared Rochwerg regarding received ALS Notes).

[31]   *Id.* ¶ 34.

[32]   *Id.*

[33]   *Id.*

[34]   *Id.* ¶ 35.

## C. THE PTO ACCRUAL

In early March 2018, CLP provided its Closing Balance Sheet and Closing Date Schedule to Seller Defendants.[35] After receiving CLP's working capital position, Seller Defendants contacted Ms. McGrath to request supporting documents and information relating to CLP's working capital.[36] Ms. McGrath didn't provide a substantive response due to a "no contact" order instituted by CLP between Seller Defendants and ABS employees, who were told by CLP that they would be fired "for cause" for speaking with Seller Defendants.[37]

On or about March 30, 2018, Seller Defendants issued a Dispute Notice to CLP relating to CLP's Closing Net Working Capital Amount calculation.[38] Seller Defendants issued it without prejudice and reserved their rights with respect to all disputed claims as CLP hadn't given access to ABS's books and records beforehand.[39]

Nine days before the conclusion of the review period, Seller Defendants again requested CLP provide the details of PTO accruals as of closing and a copy of

---

[35] *Id.* ¶ 57.

[36] Am. Countercl. ¶ 58.

[37] *Id.* ¶¶ 59-60.

[38] *Id.* ¶ 61.

[39] *Id.* ¶ 62.

management's adjusted calculations in its Exhibit A to the Dispute Notice.[40] CLP provided these materials on April 11, 2018, after the review period ended.[41]

After unsuccessful attempts to resolve their disputes, the parties engaged in the Post-Closing Purchase Price Adjustment dispute process with Grant Thornton, the Designated Accounting Firm.[42] Seller Defendants submitted their Opening Submission to Grant Thornton, challenging CLP's recordation of ABS's accruals related to earned PTO, including the methodology used to calculate the PTO accruals.[43] Seller Defendants argued that CLP's calculation of PTO Accruals in the amount of $⬛ was: (1) based on unsupportable assumptions; (2) was grossly overstated; (3) an inaccurate reflection of earned-to-date unused PTO balance; and, (4) inconsistent with the accounting policy, methodologies, and practice used in preparing the Most Recent Balance Sheet.[44] According to Seller Defendants, the proper calculation yielded $⬛.[45] CLP replied that Seller Defendants failed to raise this dispute in the Dispute Notice or prior to the end of the Review Period.

---

[40] *Id.* ¶ 63.

[41] *Id.* ¶ 64.

[42] Am. Countercl. ¶¶ 66-67.

[43] *Id.* ¶¶ 67-68, Ex. K (Seller Defendants' Opening Submission to Grant Thornton).

[44] *Id.* ¶ 69.

[45] *Id.* ¶ 70.

Grant Thornton declined to rule on the dispute relating to the PTO accruals because Seller Defendants didn't include it in the Dispute Notice.[46] Grant Thornton—citing its own reading of the terms of the SPA and its understanding of its review authority granted—said it could not review the PTO accrual dispute.[47] Grant Thornton specifically noted in its report that:

> Additional disputes arising from or pertaining to adherence to the SPA, or lack thereof (*i.e.*, providing reasonable access to documents, etc.) likely requires a legal interpretation which would have to be addressed outside of this dispute process. An assessment of this nature is outside the bounds of my engagement as an Arbitrator at the Designated Accounting Firm.[48]

## D. THE CONTINGENT PAYMENTS

In September 2018, Seller Defendants learned that CLP created a separate, "specialty testing" entity called CanMedLabs, a laboratory that conducts testing and analysis for cannabis and cannabis-related products.[49] Seller Defendants also learned that CLP set up another partnership with Specialty Testing Solutions, a company that engages in laboratory testing of cannabis products.[50] According to

---

[46] *Id.* ¶ 78.

[47] *Id.* ¶ 79.

[48] Am. Countercl. ¶ 79; *see id.* at Ex. N (Grant Thornton Designated Accounting Firm Report).

[49] *Id.* ¶¶ 44-45.

[50] *Id.* ¶ 46.

Seller Defendants, CLP promoted alternative business opportunities instead of promoting ABS. Seller Defendants allege CLP included no payments from the "cannabis testing entity" on ABS's 2018 Audited Financials, which showed a Gross Profit of $█████████.[51]

So Seller Defendants sent CLP a letter stating that it learned of CLP's efforts to avoid the Contingent Payment by establishing an off-the-books entity engaged in cannabis testing, utilizing ABS employees, and utilizing the entities to service ABS customers.[52] Seller Defendants said they wanted discovery into efforts and communications relating to the entity and intended to seek to recover any amounts improperly diverted from Seller.[53]

CLP replied about a month later that:

> [T]here is no claim relating to the so-called 'off-balance sheet cannabis testing entity' or evidence that there was some intent by Buyer to use the separate entity to shelter income to avoid making a contingent payment to Seller. The contingent payment calculation is not a ripe dispute as the Company's 2018 audited financials have not been provided to Seller under the timing outlined in Section 3.3 of the [SPA] . . . . Buyer has planned to include the numbers in the contingent payment calculation for this entity and its auditor is fully aware of the creation of the entity.[54]

---

[51] *Id.* ¶¶ 50-51.

[52] *Id.* ¶ 48, Ex. H (Seller Defendants Letter to CLP's Indemnification Claim Notice).

[53] *Id.* at Ex. H.

[54] Am. Countercl., Ex. I at 10 (Oct. 19, 2018 CLP Response Letter to Seller Defendants' Sept. 21, 2018 Letter).

On May 7, 2019, CLP delivered the 2018 Audited Consolidation Financials as well as the required certification that Seller Defendants were not entitled to a Contingent Payment because the Gross Profit was more than $███████ below the $███████ threshold for Seller Defendants to be paid a Contingent Payment.[55] After delivery, Seller Defendants requested access to ABS's books and records to determine whether the 2018 Audited Consolidated Financials included CLP's cannabis testing entity.[56] Counsel for CLP assured Seller Defendants that "the audited 2018 consolidated financial statements for CLP Testing, Inc. cover the financial position of all ABS related subsidiaries, including the 'cannabis testing' entity identified in Sellers' September 21, 2018 letter."[57]

After receiving CLP's letter, Seller Defendants initiated the Section 3.3(c) Litigation in the Court of Chancery, seeking access to ABS's books and records.[58] During the litigation, the parties mutually agreed to a 90-day extension for Seller Defendants to contest the Gross Profit and Contingent Payment calculation up to and including September 19, 2019.[59] The parties later extended Seller Defendants'

---

[55] Countercl. Def.'s Open. Br. 11.

[56] *Id.* at 12.

[57] *Id.* (citing Transmittal Aff. of Elizabeth Powers, Ex. D, Jul. 11, 2019 (D.I. 19) (CLP Response Letter to Seller Defendants' May 16, 2019 Letter)).

[58] *Id.*

[59] *Id.* at 12-13.

deadline to issue a Contingent Payment Dispute Notice an additional 60 days until November 8, 2019.[60] Seller Defendants have yet to deliver a Dispute Notice to CLP.[61]

## II. PARTIES CONTENTIONS

### A. CLP'S COMPLAINT

In October 2018, CLP filed its complaint against Seller Defendants for fraudulent inducement, fraud, breach of contract, unjust enrichment, disgorgement, civil conspiracy, and fraudulent transfer.[62] It alleges Seller Defendants defrauded CLP of millions of dollars through various avenues, including concealing the loss of important customers and manipulating the EBITDA for the sale of ABS.[63]

### B. SELLER DEFENDANTS' COUNTERCLAIMS

Seller Defendants' Amended Counterclaims outline five causes of action.[64] Counterclaim Count I is a breach-of-contract claim, alleging CLP breached SPA Section 3.3 by committing acts to reduce ABS's profitability and thus avoid meeting

---

[60] *Id.* at 13.

[61] Countercl. Def.'s Open. Br. 13.

[62] Compl. ¶¶ 169-264, Oct. 31, 2018 (D.I. 1).

[63] *Id.* ¶¶ 7-8.

[64] Am. Countercl. ¶¶ 84-113.

the required Gross Profit for the Earnout Period to make Contingent Payments to Seller Defendants.[65]

Counterclaim Count II is also a breach-of-contract claim.[66] This one alleges CLP breached (1) SPA Section 3.2(i) by failing to provide Seller Defendants with reasonable access to ABS's books and records, and (2) SPA Section 3.2(b) by withholding and delaying the necessary information to assess and identify errors related to ABS's PTO accrual, as well as purposely and fraudulently manipulating the post-Closing Purchase Price Adjustment process to extract an undeserved windfall.[67]

Counterclaim Count III is another breach-of-contract claim.[68] Here it's alleged that CLP breached the agreement on the ALS Notes by refusing to transfer to Seller Defendants the ALS Balance, any amounts collected thereunder, or the right to collect on the ALS Balance via the ALS Notes.[69]

Counterclaim Count IV alleges civil conversion as an alternative to this last breach-of-contract counterclaim to the extent that CLP exercised dominion and/or

---

[65]   *Id.* ¶¶ 85-89.

[66]   *Id.* at 29.

[67]   *Id.* ¶¶ 91-96.

[68]   *Id.* at 31.

[69]   *Id.* ¶¶ 98-102.

interference over Seller Defendants' possessory interest in the ALS Balance by (1) directing ABS to directly collect on the ALS Balance, and (2) failing to transfer the Balance or any right to collect on the Balance.[70]

Counterclaim Count V is an unjust enrichment claim—again as an alternative to the third breach-of-contract counterclaim—alleging that Counterclaim-Defendants were unjustly enriched in the amount of $████ when ABS received payments from ALS, even though it had no right to the ALS Balance due to the parties' pre-Closing oral agreement that ABS was required to transfer the Balance and the right to collect on the Balance to Seller Defendants Holdings.[71]

## C. CLP'S MOTION TO DISMISS

According to CLP, Seller Defendants' counterclaims should be dismissed in their entirety.[72]

First, CLP argues that Counterclaim Count I for breach of SPA Section 3.3 (1) is beyond the subject matter jurisdiction of this Court because Seller Defendants failed to follow the Dispute Resolution Procedures and dispute the Gross Profit

---

[70] Am. Countercl. ¶¶ 104-107.

[71] *Id.* ¶¶ 109-113.

[72] Countercl. Def.'s Open. Br. 4.

within 45 days, and (2) otherwise failed to plead that CLP diverted revenue to avoid the Contingent Payment.[73]

Second, CLP argues that Counterclaim Count II for breach of SPA Section 3.2 is beyond the subject matter jurisdiction of this Court because Seller Defendants failed to dispute (1) the PTO Accrual Issue in the Closing Net Working Capital Arbitration, and (2) the treatment of the PTO Accruals in the Dispute Notice.[74]

Third, CLP argues that Counterclaim Count III for breach of contract, Count IV for civil conversion, and Count V for unjust enrichment fail to plead an interest— contractual or otherwise—in the ALS Notes that would be required to support any of those breach-of-contract, conversion, and unjust enrichment claims.[75]

## III. STANDARD OF REVIEW

"Under Rule 12(b)(6), 'the legal issue to be decided is whether a plaintiff may recover under any reasonably conceivable set of circumstances susceptible of proof under the complaint.'"[76]  Under that Rule, the Court will

> (1) accept all well pleaded factual allegations as true, (2) accept even vague allegations as "well pleaded" if they give the

---

[73]  *Id.* at 29, 33.

[74]  *Id.* at 36, 41.

[75]  *Id.* at 43.

[76]  *Vinton v. Grayson*, 189 A.3d 695, 700 (Del. Super. Ct. 2018) (quoting *L&L Broad, LLC v. Triad Broad. Co.*, 2014 WL 17224769, at *2 (Del. Super. Ct. Apr. 8, 2014)).  Court of Chancery Rule 12(b)(6) and Superior Court Rule 12(b)(6) are identical.

opposing party notice of the claim, (3) draw all reasonable inferences in favor of the non-moving party, and (4) not dismiss the claims unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances.[77]

"If any reasonable conception can be formulated to allow Plaintiffs' recovery, the motion must be denied."[78]

The Court must accept as true all well-pleaded allegations for Rule 12(b)(6) purposes.[79] And every reasonable factual inference will be drawn in the non-moving party's favor.[80] If the claimant may recover under that standard, then the Court must deny the motion to dismiss.[81] This is because "[d]ismissal is warranted [only] where the plaintiff has failed to plead facts supporting an element of the claim, or that under no reasonable interpretation of the facts alleged could the complaint state a claim for which relief might be granted."[82]

---

[77] *Vinton*, 189 A.3d at 700. (quoting *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs., LLC*, 27 A.3d 531, 535 (Del. 2011)).

[78] *Vinton*, 189 A.3d 700 (citing *Cent. Mortg. Co.*, 27 A.3d at 535).

[79] *Anderson v. Tingle*, 2011 WL 3654531, at *2 (Del. Super. Ct. Aug 15, 2011).

[80] *Wilmington Sav. Fund Soc'y, F.S.B. v. Anderson*, 2009 WL 597268, at *2 (Del. Super. Ct. Mar. 9, 2009) (citing *Doe v. Cahill*, 884 A.2d 451, 458 (Del. 2005)).

[81] *Spence v. Funk*, 396 A.2d 967, 968 (Del. 1978).

[82] *Hedenberg v. Raber*, 2004 WL 2191164, at *1 (Del. Super. Ct. Aug. 20, 2004).

"Unlike the standards employed in Rule 12(b)(6) analysis, the guidelines for the Court's review of [a] Rule 12(b)(1) motion are far more demanding of the non-movant."[83] The plaintiff must shoulder the burden of proving that jurisdiction exists.[84] And in determining whether the plaintiff has, the Court need not accept its factual allegations as true and is free to consider facts not alleged in the complaint.[85]

Each of these well-established rules that the Court applies to a suit-initiating plaintiff's claims are of equal utility when assessing an answering defendant's (*i.e.*, counterclaim-plaintiff's) counterclaims.[86]

## IV. DISCUSSION

### A. COUNTERCLAIMS I AND II: SUBJECT MATTER JURISDICTION.

Under 12(b)(1), CLP first argues that Counterclaim Count I for breach of SPA Section 3.3 is beyond the subject matter jurisdiction of this Court because Seller Defendants failed to follow the Dispute Resolution Procedures and dispute the Gross Profit within 45 days.[87] Seller Defendants argue in response that the claim is not

---

[83] *Appriva S'holder Litig. Co., LLC v. EV3, Inc.*, 937 A.2d 1275, 1284 n.14 (Del. 2007) (quoting *Phillips v. Cty. of Bucks*, 1999 WL 600541, at *1 (E.D. Pa. Aug. 9, 1999)).

[84] *Appriva*, 937 A.2d at 1284 n.14.

[85] *Id.*

[86] *inVentiv Health Clinical, LLC v. Odonate Therapeutics, Inc.*, 2021 WL 252823, at *4 (Del. Super. Ct. Jan. 26, 2021).

[87] Countercl. Def.'s Open. Br. 29-30.

subject to arbitration because it concerns the legal issue of breach of the SPA, not an accounting issue.[88]

CLP next argues that Counterclaim Count II for breach of SPA Section 3.2 is beyond the Court's subject matter jurisdiction because Seller Defendants failed to dispute (1) the PTO Accrual Issue in the Closing Net Working Capital Arbitration, and (2) the treatment of the PTO Accruals in the Dispute Notice.[89] Seller Defendants respond here, again, that the PTO Accrual claim is not subject to arbitration because it concerns the legal issue of breach of the SPA, not an accounting issue.[90]

When considering a motion to dismiss for lack of subject matter jurisdiction, the Court must address the nature of (1) the wrong alleged, and (2) the remedy sought, to determine whether a legal, as opposed to an equitable, remedy is available and adequate.[91] If a claim is properly committed to arbitration and is thus arbitrable, this Court lacks subject matter jurisdiction because arbitration provides an adequate legal remedy.[92] Delaware's public policy strongly favors arbitration unless the

---

[88] Countercl. Pls.' in Opp. To Countercl. Def.'s Mot. to Dismiss 14-15, Jan. 11, 2021 (D.I. 113) (hereinafter "Countercl. Pls.' Ans. Br.").

[89] Countercl. Def.'s Open. Br. 36-37.

[90] Countercl. Pls.' Ans. Br. 15-16.

[91] *Carder v. Carl M. Freeman Cmtys., LLC*, 2009 WL 106510, at *3 (Del. Ch. Jan. 5, 2009).

[92] *Id.*

parties did not contractually agree to arbitrate.[93] A motion to dismiss for lack of subject matter jurisdiction will be granted if the dispute is one that, on its face, falls within the contract's arbitration clause.[94]

Delaware courts will compel a party to arbitrate only if the contract reflects that the parties clearly and intentionally bargained for whether and how to arbitrate.[95] Whether parties agree to arbitrate is commonly referred to as "substantive arbitrability" and is an issue for resolution by the Court.[96] "Procedural arbitrability" questions, on the other hand, are decided by the arbitrator.[97]

Issues of substantive arbitrability are "gateway questions relating to the scope of an arbitration provision and its applicability to a given dispute, and are presumptively decided by the court."[98] Procedural arbitrability issues "concern

---

[93] *Id.*; *see also NAMA Holdings, LLC v. Related World Mkt. Ctr., LLC*, 922 A.2d 417, 429 (Del. Ch. 2007) ("Because the strong public policy in favor of arbitration embodied in federal law is given equal respect in this State, a motion to dismiss for lack of subject matter jurisdiction will be granted if the 'dispute is one that, on its face, falls within the arbitration clause of the contract.'" (citation omitted) (quoting *SBC Interactive, Inc. v. Corp. Media Partners*, 714 A.2d 758, 761 (Del. 1998))); *Anadarko Petroleum Corp. v. Panhandle E. Corp.*, 1987 WL 13520, at *8 (Del. Ch. July 7, 1987) ("Both Delaware and federal law recognize a strong public policy in favor of arbitration.").

[94] *NAMA Holdings, LLC*, 922 A.2d at 429-30.

[95] *Kuhn Constr., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396 (Del. 2010).

[96] *Viacom Int'l, Inc. v. Winshall*, 2012 WL 3249620, at *12 (Del. Ch. Aug. 9, 2012), *aff'd*, 72 A.3d 78, 82 (Del. 2013).

[97] *Viacom Int'l, Inc*, 2012 WL 3249620, at *12.

[98] *Id.*

whether the parties have complied with the terms of an arbitration provision, and are presumptively handled by arbitrators."[99]  Procedural arbitrability issues include "whether prerequisites such as time limits, notice, laches, estoppel, and other conditions precedent to an obligation to arbitrate have been met, as well as allegations of waiver, delay, or a like defense to arbitrability."[100]

The only question a court should decide is whether the subject matter in dispute falls within an arbitration provision.[101]  If the subject matter to be arbitrated is the calculation of an earn-out, or the amount of working capital, or the company's net worth at closing, then all issues as to what financial or other information should be considered in performing those calculations are to be decided by the arbitrator.[102]

### 1. The Court Lacks Subject Matter Jurisdiction Over Counterclaim I.

In contending that CLP breached Section 3.3 by creating separate "special testing" entities to divert funds away from ABS and avoid meeting the Gross Profit

---

[99]  *Id.*

[100]  *Id.*

[101]  *Viacom Int'l, Inc.*, 72 A.3d at 82-83 ("Only when there is a question regarding whether the parties should be arbitrating at all is a question of arbitrability raised for the court to resolve." (cleaned up)).

[102]  *Id.* at 83 ("Once it is determined . . . that the parties are obligated to submit the subject matter of a dispute to arbitration, 'procedural' questions that grow out of the dispute and bear on its final disposition should be left to the arbitrator." (cleaned up)); *see Weiner v. Milliken Design, Inc.*, 2015 WL 401705, at *10 (Del. Ch. Jan. 30, 2015) (holding an arbitrator should decide issues when dealing with earn-out calculations and related definitions of "Revenue" because the parties agreed to resolve earn-out calculation disputes through arbitration).

required to trigger the Contingent Payments, Seller Defendants ask the Court to decide issues of procedural arbitrability. The Court can't do that. SPA Section 3.3 clearly provides for arbitration of unresolved disputes that arise in the process of the calculation and payment of the Contingent Payments. The fact that CLP also breached the SPA does not transform the procedural and formal requirements of that provision into "gateway questions" of substantive arbitrability. Again, the only question the Court should decide here is "whether the subject matter of [the] dispute"—here, funds diverted from the Gross Profit and Contingent Payment calculation—falls within Section 3.3's arbitration provision.[103] It does; particularly insofar as the calculation of Gross Profit is fundamental to the understanding of whether CLP diverted funds from ABS.

During the Section 3.3 Chancery litigation, the parties agreed to extend the Dispute Notice deadline for an additional 150 days. Put differently, Seller Defendants bargained for and received extra time to arbitrate the issues of which it now complains. Notably, Seller Defendants failed to file a Dispute Notice. Even with their failure to file a Dispute Notice, however, it's clear from Seller Defendants' actions that they contemplated and agreed to participate in the arbitration process for

---

[103] *Viacom Int'l, Inc.*, 72 A.3d at 83; *see LDC Parent, LLC v. Essential Utils., Inc.*, 2021 WL 1884847, at *5-6 (Del. Super. Ct. Apr. 28, 2021) (holding questions that require accounting expertise will implicate the agreement's dispute resolution provision and declining to determine whether the Independent Accounting Firm will act as an expert or an arbitrator).

issues related to calculation of Gross Profit. No doubt, the Court cannot adjudicate matters that parties contractually agreed to arbitrate. So, Count I is not yet within the Court's jurisdiction. And so, the Court cannot provide the legal remedy Seller Defendants now seek. [104]

Seller Defendants' claim that they were relieved of their obligation to issue a Dispute Notice due to the doctrine of futility does not transform the procedural and formal requirements of Section 3.3 into gateway questions of substantive arbitrability. Even if the Court did accept Seller Defendants' futility argument, the subject matter of the issue—in Seller Defendants' own words, "challenging that they have diverted revenue that *must be included in their calculation*"—still falls within Section 3.3's arbitration provision, and as such, is an issue of procedural arbitrability left for an arbitrator to decide.[105]

Looking objectively at the subject matter in dispute, as well as Seller Defendants' very own characterization of it, it is clear that Seller Defendants present an issue of procedural arbitrability suitable for an arbitrator to decide. And this Court cannot exercise subject matter jurisdiction over a claim properly committed to

---

[104] Although the Court must dismiss Seller Defendants' Counterclaim Count I, it may well be that Seller Defendants' argument that it was relieved of its obligation to issue a Dispute Notice due to futility is cognizable. But, because the issue presents as one of procedural arbitrability, it is not justiciable here and now. And so, Counterclaim Count I is dismissed without prejudice—at least until completion of the arbitration process.

[105] Oral Arg. Tr. at 30, Mar. 18, 2021 (D.I. 122) (emphasis added).

arbitration. Accordingly, CLP's motion to dismiss Counterclaim Count I for lack of subject matter jurisdiction is **GRANTED**.

### 2. The Court Has Subject Matter Jurisdiction Over Counterclaim II.

When saying that CLP breached Section 3.3 by failing to grant reasonable access to ABS's books and records as required by SPA Section 3.2(c)(i), Seller Defendants ask the Court to decide issues of substantive arbitrability and sufficiently sustain their burden to prove the Court's jurisdiction over such exists. Section 3.2(c)(i) of the Agreement suggests no arbitration requirement. It commands that CLP:

> shall provide [Seller Defendants] and any Representatives, accountants or advisors retained by [Seller Defendants] with reasonable access to the books and records of [ABS] for the purpose of enabling [Seller Defendants] and their respective accountants and advisors to calculate, and to review [CLP's] calculation and preparation of, the Closing Net Working Capital Amount . . . .[106]

Looking at the subject matter of dispute—here, whether CLP granted reasonable access to ABS's books and records—the dispute does not fall within any arbitration provision. So, the subject matter of the dispute is a gateway question relating to the scope of an arbitration provision. And so, Counterclaim Count II is an issue of substantive arbitrability that lies within this Court's subject matter jurisdiction.

---

[106] Am. Countercl. ¶ 55.

What's more, the parties previously engaged in the arbitration process for the dispute over the PTO accrual calculation and Grant Thornton declined to rule on the dispute. According to Grant Thornton:

> Additional disputes arising from or pertaining to adherence to the SPA, or lack thereof (*i.e.*, providing reasonable access to documents, etc.) likely requires a legal interpretation which would have to be addressed outside of this dispute process. An assessment of this nature is outside the bounds of my engagement as an Arbitrator at the Designated Accounting Firm.[107]

Grant Thornton expressly determined that assessing whether CLP provided reasonable access to documents was outside the bounds of its role as arbitrator.

Looking at the Agreement's language itself (aided by Grant Thornton's arbitration determination), it's clear that the question of whether CLP failed to grant reasonable access to ABS's books and records doesn't fall within any arbitration provision. Because the parties did not contractually agree to arbitrate disputes related to reasonable access to books and records, arbitration provides no adequate legal remedy. Consequently, the Court has subject matter jurisdiction over Counterclaim Count II alleging breach of contract for failure to grant reasonable access to books and records. And so, CLP's request to dismiss that count for lack of subject matter jurisdiction is **DENIED.**

---

[107] *Id.* ¶ 79, Ex. N.

**B. COUNTERCLAIM COUNTS I, II, AND III: BREACH OF CONTRACT.**

Under 12(b)(6), CLP argues Seller Defendants failed to adequately state breach-of-contract claims that (1) CLP diverted revenue to avoid the Contingent Payment, and (2) Seller Defendants have an interest, contractual or otherwise, in the ALS Notes.

Seller Defendants argue in response that they have pled in sufficient detail that (1) CLP caused ABS to take direct actions to lower its Gross Profit for the primary purpose of reducing or eliminating the Contingent Payment, and (2) the parties confirmed the ALS Balance exchange in writing and as such, Seller Defendants have an interest in the Balance.

To reiterate, the Court lacks subject matter jurisdiction for claims related to what financial or other information should be considered in performing the calculation of the Contingent Payment, and Counterclaim Count I must therefore be dismissed on that basis alone. In turn, the Court need not further determine whether Seller Defendants adequately state their charge of breach-of-contract for diverting revenue to reduce ABS's Gross Profit to avoid the Contingent Payment in that counterclaim.

As to Seller Defendants' breach-of-contract counterclaim (Count II) for CLP's failure to grant access to ABS's books and records, CLP does not argue that Seller Defendants failed to state a claim—instead, CLP argues Seller Defendants

waived the ability to dispute their lack of access to ABS's books and records by failing to comply with the Dispute Resolution Procedures. But, as pled, this is no stand-alone 12(b)(6) argument for failure to state a claim. Rather, this is a mere continuation of CLP's already-rejected 12(b)(1) argument for lack of subject matter jurisdiction. So the Court need address it no further.

That leaves CLP's Rule 12(b)(6) challenge to Counterclaim Count III for breach of the ALS Note agreement.

A plaintiff alleging breach of contract must plead: (1) the existence of an express or implied contract; (2) the breach of an obligation imposed by the contract; and, (3) damages resulting from such breach.[108] To recover for damages, the plaintiff must demonstrate that he substantially complied with all provisions of the contract.[109] "[T]he interpretation of a contract is a question of law suitable for determination on a motion to dismiss."[110] There are three elements for a valid, enforceable contract: (1) the parties intended that the contract would bind them; (2) the terms of the contract are sufficiently definite; and, (3) the parties exchange legal consideration.[111]

---

[108] *Shah v. Am. Sols., Inc.*, 2012 WL 1413593, at *2 (Del. Super. Ct. Mar. 8, 2012) (citing *VLIW Tech., LLC v. Hewlett–Packard Co.*, 840 A.2d 606, 612 (Del. 2003)).

[109] *Id.*

[110] *MicroStrategy Inc. v. Acacia Rsch. Corp.*, 2010 WL 5550455, at *5 (Del. Ch. Dec. 30, 2010).

[111] *Bryant v. Way*, 2011 WL 2163606, at *4 (Del. Super. Ct. May 25, 2011).

The Court interprets a contract's words using their common and ordinary meaning unless the contract's own language reveals the parties specifically intended some other meaning be given.[112] If the language is clear and unambiguous, the ordinary meaning will establish the parties' intent.[113] But language is ambiguous if it's reasonably susceptible to different interpretations.[114] And on a motion to dismiss, the Court can't just choose between two differing reasonable interpretations of such ambiguous language.[115]

A court will only consider recovery under an implied contract if there is no express contract governing the parties' rights and obligations.[116] An implied contractual obligation cannot flow from matters expressly addressed in a written contract.[117] Rather, a contract will be implied-in-fact only when the Court might

---

[112] *Cove on Herring Creek Homeowns.' Ass'n Inc. v. Riggs*, 2005 WL 1252399, at *1 (Del. Ch. May 19, 2005).

[113] *MicroStrategy Inc.*, 2010 WL 5550455, at * 5.

[114] *Id.*

[115] *E.g.*, *Vanderbilt Income & Growth Assocs., L.L.C. v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 613 (Del. 1996).

[116] *Weik, Nitsche & Dougherty, LLC v. Pratcher*, 2020 WL 5036096, at *4 (Del. Ch. Aug. 26, 2020) (holding that defendant sufficiently pled breach of implied contract when alleging a course of dealing that governed the parties' relationship after plaintiffs' resignation because the Court could reasonably infer an implied contract existed based on the presumed intention of the parties (citing *Good v. Moyer*, 2012 WL 4857367, at *5 (Del. Super. Ct. Oct. 10, 2012))).

[117] *Good*, 2012 WL 4857367, at *5.

fairly infer such an intent from the evidence and the agreement represents the presumed intention of the parties as demonstrated by their conduct.[118]

Seller Defendants adequately allege a breach-of-contract claim for failure to transfer the ALS Balance or the right to collect on the Balance. While they may well have failed to sufficiently plead the existence of an express agreement, Seller Defendants have sufficiently pled the existence of an implied agreement.

Drawing all reasonable inferences in favor of the Seller Defendants, there are two reasonable interpretations of the parties' treatment of the ALS Notes: (1) the SPA specifically omitted the ALS Balance from its assigned Accounts Receivable provision and is the express, enforceable contract that controls the parties relationship pertaining to the ALS Balance; or (2) the ALS Agreement was specifically omitted in light of the fact that the parties had already bargained for and accepted a reduced sale price for ABS in exchange for Seller Defendants collecting directly on the ALS Balance. Even under Delaware's minimal pleading standards, the language of the e-mail communications between CLP's and Seller Defendants' counsel are reasonably susceptible to differing interpretations and as such, there is no express agreement regarding the ALS Notes.

---

[118] *Creditors' Comm. of Essex Builders, Inc. v. Farmers Bank*, 251 A.2d 546, 548 (Del. 1969) (holding no implied contract exists when banks independently decide to extend credit to Creditors because the parties acted in their own interest and the collision of such interests is an insufficient reason to imply an agreement).

There are sufficient facts in the Counterclaim, however, that a valid and enforceable implied contract exists. Here, the e-mails between the Lazard Representative for CLP and Seller Defendants indicate that CLP "agreed to remove the ALS notes from WC" and Seller Defendants would "receive 100% of the collections from the note."[119] And counsel for each party noted that the parties agreed Seller Defendants would enter into notes directly with ALS for the Balance.[120] Lastly, the purchase price for ABS was reduced by the value of the ALS Notes—the ABS Closing Net Working Capital schedule submitted by CLP states "[t]he Company prior to close executed two notes receivable with [ALS] which by definition are excluded from working capital."[121]

Given these facts, the presumed intention of the parties' conduct demonstrates, at the very least, that they were bound to reduce the ABS purchase price in exchange for Seller Defendants collecting on the ALS Notes. And because Seller Defendants have adequately alleged that: (1) an implied contract exists; (2) CLP breached its contractual obligation to transfer the ALS Balance or the right

---

[119] Am. Countercl., Ex. D. The Court may consider these documents on a motion to dismiss. *E.g.*, *Windsor I, LLC v. CWCap. Asset Mgmt. LLC*, 238 A.3d 863, 873 (Del. 2020); *see also Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001) ("[A] claim may be dismissed if the allegations in the complaint or in the exhibits incorporated into the complaint effectively negate the claim as a matter of law.").

[120] Am. Countercl., Ex. E.

[121] *Id.* at Ex. P.

to collect on the Balance; and, (3) due to the breach, Seller Defendants suffered damages in the amount of $███████ plus interest, they have met Delaware's minimal pleading standard for this breach-of-contract count.

As such, CLP's Motion to Dismiss as to Counterclaim Count III for failure to state a breach-of-contract claim is **DENIED.**

## C. COUNTERCLAIM IV: CIVIL CONVERSION.

CLP argues Seller Defendants failed to state a claim for conversion because they did not plead an interest, contractual or otherwise, in the ALS Notes. Seller Defendants argue in response that they sufficiently alleged that the parties confirmed the ALS Balance exchange in writing and as such, Seller Defendants have an interest in the Balance.

Conversion is the "act of dominion wrongfully exerted over the property of another, in denial of his right, or inconsistent with it."[122] The necessary elements for a conversion under Delaware law are that a plaintiff: (1) had a property interest in the converted goods; (2) had a right to possession of the goods; and, (3) the property was converted.[123]

---

[122] *McGowan v. Ferro*, 859 A.2d 1012, 1040 (Del. Ch. 2004) (quoting *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 678 A.2d 533, 536 (Del. 1996)).

[123] *Gould v. Gould*, 2012 WL 3291850, at *7 (Del. Ch. Aug. 14, 2012).

Generally, an action in conversion will not lie to enforce a claim for the payment of money.[124] One narrow exception allows a claim for conversion of money "only when it can be described or identified as a specific chattel, but not where an indebtedness may be discharged by the payment of money generally."[125] So, an action for conversion of money will only lie where there is an "obligation to return the identical money" delivered by the plaintiff to the defendant.[126]

Seller Defendants plead a conversion claim seeking the payment of $███████ plus interest. Again, in Delaware, a conversion claim will not lie where the complainant simply seeks the payment of some sum of money derived from a contract or other right.[127] And Seller Defendants fail to plead that their conversion

---

[124] *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 890 (Del. Ch. 2009); *see also Stone & Paper Invs., LLC v. Blanch*, 2020 WL 3496694, at *11 (Del. Ch. Jun. 29, 2020) ("As to Clovis, the conversion claim fails because it is a claim for the payment of money.").

[125] *Kuroda*, 971 A.2d at 890 (quoting *Goodrich v. E.F. Hutton Grp., Inc.*, 542 A.2d 1200, 1203 (Del. Ch. 1988)).

[126] *Kuroda*, 971 A.2d at 890 (internal quotation marks omitted).

[127] *See id.* ("[T]o establish a claim for conversion apart from the contract claim, [the plaintiff] would have to show that he had a right to the money—other than a right pursuant to the contract— that was violated by the defendants' exercise of dominion over the money."); *Stone & Paper*, 2020 WL 3496694, at *11 (conversion claim failed because it was just a claim for the repayment of allegedly misused money).

claim falls within the narrow-recognized exception—*i.e.* that CLP has an obligation to return the "identical money" allegedly owed.[128]

At bottom, Seller Defendants are seeking the satisfaction of a contractual obligation that can be satisfied by the payment of money generally. CLP's motion to dismiss as to Counterclaim Count IV for failure to state a conversion claim must be **GRANTED.**

### D. COUNTERCLAIM V: UNJUST ENRICHMENT.

CLP argues Seller Defendants failed to state a claim for unjust enrichment because they did not plead an interest, contractual or otherwise, in the ALS Notes. Seller Defendants argue in response that they sufficiently alleged that the parties confirmed the ALS Balance exchange in writing and as such, Seller Defendants have an interest in the Balance.

Unjust enrichment is the "unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity or good conscience."[129] In order to recover on a claim of unjust enrichment, a plaintiff must prove: (1) an enrichment; (2) an impoverishment;

---

[128] *See Kuroda*, 971 A.2d at 890 ("Generally, an action for conversion of money will lie only where there is 'an obligation to return the identical money' delivered by the plaintiff to the defendant." (cleaned up)).

[129] *Fleer Corp. v. Topps Chewing Gum, Inc.*, 539 A.2d 1060, 1062 (Del. 1988) (internal quotation marks omitted).

(3) a relation between the enrichment and impoverishment; (4) the absence of justification; and, (5) the absence of a remedy provided by law.[130]

Courts developed unjust enrichment as a theory of recovery to remedy the absence of a formal contract.[131] As such, claims of unjust enrichment may survive a motion to dismiss when the validity of the contract is in doubt or uncertain.[132] When the complaint alleges an express, enforceable contract that controls the parties' relationship, a claim for unjust enrichment will be dismissed.[133]

Seller Defendants adequately allege an unjust enrichment claim. The complaint alleges that: (1) ABS was enriched by receiving the ALS Balance; (2) Seller Defendants were unable to collect on the ALS Balance or exercise the right to collect on the Balance; (3) ABS was enriched at Counterclaim Plaintiff's expense; (4) ABS had no right to the balance; and, (5) the unjust enrichment claim is in the alternative to the breach-of-contract claim with respect to the ALS Note agreement.

---

[130] *Jackson Nat'l Life Ins. Co. v. Kennedy*, 741 A.2d 377, 393-94 (Del. Ch. 1999) (citing *Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571, 585 (Del. Ch. 1998)).

[131] *ID Biomed. Corp. v. TM Techs., Inc.*, 1995 WL 130743, at *15 (Del. Ch. Mar. 16, 1995).

[132] *Bakerman v. Sidney Frank Importing Co.*, 2006 WL 3927242, at *18 (Del. Ch. Oct. 10, 2006) (citing *Student Fin. Corp. v. Royal Indem. Co.*, 2004 WL 609329, at *7 (D. Del. March 23, 2004)) (rejecting dismissal of unjust enrichment claim when complaint alleged underlying contract was valid and subject to recission due to fraud because there was no valid contract precluding the unjust enrichment theory).

[133] *Bakerman*, 2006 WL 3927242, at *18 (citing *Rossdeutscher v. Viacom, Inc.*, 768 A.2d 8, 24 (Del. 2001)).

Importantly, Seller Defendants are not required at this point to *prove* their right to recovery on this counterclaim. Instead, it must be reasonably conceivable that they may recover under their unjust enrichment theory. The Seller Defendants are claiming unjust enrichment in the alternative to their breach-of-contract claim. For the reasons above, the Court will not dismiss Seller Defendants' breach-of-contract claim regarding the ALS Notes. But given the facts underlying that specific agreement—facts that the Court must here view in the light most favorable to Seller Defendants—the validity of such might be viewed as in doubt or uncertain. Yet, it is still reasonably conceivable that Seller Defendants could recover on an unjust enrichment theory, particularly if CLP ultimately convinces the Court at trial that there was no breach-of-contract under Counterclaim III. If that comes to pass, the Seller Defendants could be found to have no adequate remedy provided by law.

CLP argues that the SPA comprehensively governs the parties' rights with respect to the ALS Notes, and as such, there is no reasonably conceivable set of circumstances in which Seller Defendants' unjust enrichment claim permits recovery. Not so.

Whether there is an express, enforceable ALS Note agreement is uncertain. The ALS Note agreement was not incorporated into the final SPA, but appears to have been accepted by one of CLP's liaisons prior to closing. Again, it is reasonable

to interpret the parties' agreement that either (1) the SPA alone controls the parties' relationship as it pertains to the ALS Balance, or (2) the parties separately bargained for and accepted a reduced sale price for ABS in exchange for Seller Defendants collecting directly on the ALS Balance. Because the validity of the ALS Note agreement is uncertain and there is more than one reasonable interpretation thereof, the unjust enrichment claim can survive here.

CLP's prayer to dismiss Counterclaim Count V for failure to state an unjust enrichment claim is **DENIED.**

## V. CONCLUSION

Because the Court lacks subject matter jurisdiction to decide issues related to the calculation of Gross Profit and Contingent Payment, Counterclaim Count I (breach of SPA Section 3.3) is **DISMISSED**. Because Seller Defendants here try to engage civil conversion claim for the mere payment of a sum of money allegedly derived from a contract right, Counterclaim Count IV (civil conversion) must be **DISMISSED**.

Because the Court has subject matter jurisdiction to decide issues related to the reasonable access of books and records, CLP's request to dismiss Counterclaim Count II (breach of SPA Section 3.2(i)) is **DENIED**. Because Seller Defendants sufficiently pled a breach-of-contract claim for failure to transfer the ALS Balance or the right to collect on that balance, CLP's prayer for dismissal of Counterclaim

Count III (breach of the ALS Note agreement) is **DENIED**. And because there is more than one reasonable interpretation of the ALS Note agreement, CLP's Motion to Dismiss as to Counterclaim Count V (unjust enrichment) is **DENIED**.

    **IT IS SO ORDERED.**

_____

            Paul R. Wallace, Judge